RCA CORPORATION, Plaintiff-Appellee,

v.

UNITED STATES of America,
Defendant-Appellant.

No. 1273, Docket 80–6240.

United States Court of Appeals,
Second Circuit.

Argued May 29, 1981.
Decided Nov. 13, 1981.

Leslie R. Bennett, Asst. U. S. Atty., New York City (John S. Martin, Jr., U. S. Atty. S. D. N. Y., Michael H. Dolinger, David M. Jones, Asst. U. S. Attys., New York City, on the brief), for defendant-appellant.

Walter C. Cliff, New York City (George Wailand, Benjamin J. Cohen, Richard Coll, Cahill Gordon & Reindel, New York City, on the brief), for plaintiff-appellee.

Before FEINBERG, Chief Judge, and MANSFIELD and KEARSE, Circuit Judges.

KEARSE, Circuit Judge:

This appeal requires us to determine whether the Commissioner of Internal Revenue ("Commissioner") properly exercised his discretion when he rejected as "not clearly reflect[ing] income" within the meaning of § 446(b) of the Internal Revenue Code of 1954 ("I.R.C."), 26 U.S.C. § 446(b) (1976), the accrual method of accounting used in 1958 and 1959 by plaintiff RCA Corporation ("RCA") to account for revenues received from the prepayment of fees associated with certain service contracts entered into with purchasers of its products. The United States District Court for the Southern District of New York, 499 F.Supp. 507, Morris E. Lasker, *Judge*, held, after a bench trial, that the Commissioner had abused his discretion in rejecting RCA's accrual method of accounting, and awarded judgment to RCA in the amount of $5,956,-039.25, plus assessed deficiency interest and statutory interest, on its claim for a refund of corporate income taxes for the years 1958 and 1959. Believing that the Commissioner properly exercised his discretion, we reverse.

I

The case was tried largely on a stipulated record, and the facts are substantially undisputed. Since 1946 RCA has carried on a business, either directly or through its wholly-owned subsidiary RCA Service Company ("RCAS"), of servicing television sets and other consumer products it sold. In the typical service arrangement, the purchaser of an RCA product would contract, at the time of purchase, to receive service and repair of the product for a stated period in exchange for prepayment of a single lump sum.[1] Under these agreements, service was available to the purchaser on demand at any time during the contract term, which might range from three to twenty-four

---

1. In a certain proportion of the service contracts, the customer paid only a portion of the contract price at the beginning of the contract term, and paid the balance in installments at stated intervals during the contract term. Prepayments received under such contracts were treated in substantially the same manner as those received under contracts requiring prepayment in full. Figures stating income from service contract prepayments excluded the installment payments RCA expected to receive in the future.

months. Until 1958, this service business was conducted by RCAS. On December 31, 1957, however, RCAS was liquidated by means of its merger into RCA; thereafter RCA continued the business of RCAS through RCA's Service Company division.

RCAS, and later RCA, employed an accrual method of accounting for service contract revenues on their books. For each group of service contracts of a given duration entered into in a given month, the seller credited to current income a sum that represented the actual cost of selling and processing the contracts, plus a profit. The balance of the revenues derived from each group of contracts, i. e., the portion to be earned through future performance under them, was credited to a deferred income account. Each month thereafter, the seller journaled from the deferred income account to current income that proportion of the revenues from each group of contracts that the seller estimated had been earned in the month through actual performance. For the most part, the seller's estimates of its rate of performance for a particular class of contracts were based on its past experience in the business, and took into account such factors as seasonal repair patterns, variations in average daily workloads, and the number of working days in each month.[2] Although these forecasts were not perfect and may have rested to some extent on untested assumptions, they matched service contract revenues and related expenses with reasonable accuracy.

Although RCAS accounted for service contract revenues on an accrual basis in keeping its own books, it employed a cash method of accounting for service contract income on its tax returns.[3] For tax purposes, RCAS added to its gross taxable income for each year the amount by which the aggregate year-end balance in its deferred service contract income accounts exceeded the previous year's closing balance;

if the accounts had decreased, RCAS subtracted the amount of the decrease from its gross taxable income.

After the liquidation of RCAS, RCA continued to employ RCAS's accrual method, based on reasonably accurate forecasts of monthly variations in the demand for service, in its book accounting for the prepaid service contract income of its Service Company division. For tax purposes, however, RCA discontinued RCAS's former practice of adjusting taxable income by the amount of the annual change in the deferred service contract income accounts. Instead, RCA reported the service contract income of the Service Company division on the same accrual basis used in its books, including in taxable gross income only those service contract revenues that it estimated it had earned during the taxable year by actual performance. Thus, although the aggregate balance of the deferred income accounts increased from $8,223,755.27 to $9,497,896.51 between December 31, 1957 and December 31, 1958, RCA did not add to its gross taxable income for 1958 the $1,274,141.24 increase. Similarly, RCA did not include in its gross income for 1959 the $1,956,024.68 increase, to $11,453,921.19, that occurred in that year. In addition, in an adjustment designed to reconcile differences in book and taxable income, RCA reduced its 1958 taxable income by $7,624,775.27, thus eliminating from taxable income most of the $8,223,755.27 balance in the RCAS deferred income accounts (on which RCAS had already paid taxes) that had been credited to RCA's book income accounts after the merger. RCA reduced its taxable income for 1959 by $598,980 through a similar adjustment. These accounting changes and adjustments had the effect of reducing RCA's 1958 income taxes by $4,627,436.59 and its 1959 income taxes by $1,328,602.66. In neither 1958 nor

2. The companies had learned from experience that customers were more likely to seek service during certain seasons and on certain days of the week than they were at other times. RCA's statistics projected future demand on the basis of observed variations in past demand.

3. Although RCAS had employed an accrual method of tax accounting for this income in 1946 and 1947, it adopted the cash method in 1948, after the Commissioner rejected its accrual method as not clearly reflecting income.

1959 did RCA seek the Commissioner's permission, pursuant to I.R.C. § 446(e), to adopt its accrual method of tax accounting for service contract income.[4]

After an audit of RCA's tax returns for 1958 and 1959, the Internal Revenue Service ("IRS") required RCA to report its service contract revenues upon receipt, rather than deferring recognition of any portion of them. For 1958, this change from accrual to cash accounting increased RCA's taxable income by $8,898,916.51 and increased its tax liability by $4,627,436.59. For 1959, the adjustment increased taxable income by $2,555,004.68 and tax liability by $1,328,602.66. RCA paid these increased income taxes and filed timely administrative claims for refund of the disputed sums. RCA commenced this litigation on June 18, 1969, and, after what seems to have been a lengthy interregnum of fruitless settlement talks, the case was tried in 1979.

At trial, RCA contended, first, that its accrual method of tax accounting for prepaid service contract revenues "clearly reflect[ed] income" within the meaning of I.R.C. § 446(b), and that the Commissioner had therefore abused his discretion in rejecting that method.[5] Alternatively, RCA

argued that its adoption of the accrual method after its merger with RCAS was permissible under regulations promulgated pursuant to I.R.C. § 381(c)(4), concerning an acquiring corporation's assumption of an acquired corporation's accounting practices.[6] Finally, RCA asserted that its accrual method was acceptable because certain revenue rulings, Rev.Proc. 71–21, 1971–2 C.B. 549, and Rev.Rul. 71–299, 1971–2 C.B. 218, promulgated by the Commissioner in 1971 and permitting limited use of accounting procedures such as RCA's, are retroactive in effect.[7]

For its part, the government argued that under a trio of Supreme Court cases, *Automobile Club of Michigan v. Commissioner*, 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746 (1957), ("*Michigan*"); *American Automobile Association v. United States*, 367 U.S. 687, 81 S.Ct. 1727, 6 L.Ed.2d 1109 (1961) ("*AAA*"), and *Schlude v. Commissioner*, 372 U.S. 128, 83 S.Ct. 601, 9 L.Ed.2d 633 (1963) ("*Schlude*"), methods of accrual accounting based on projections of customers' demands for services do not "clearly reflect income," and that in view of these decisions the Commissioner did not abuse his discretion in rejecting RCA's method. The government

4. Section 446(e) provides as follows:
 (e) Requirement respecting change of accounting method.—Except as otherwise expressly provided in this chapter, a taxpayer who changes the method of accounting on the basis of which he regularly computes his income in keeping his books shall, before computing his taxable income under the new method, secure the consent of the Secretary.

5. Sections 446(a) and (b) provide as follows:
 (a) General rule.—Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books. (b) Exceptions.—If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income.

6. Section 381(c)(4) provides as follows:
 (4) Method of accounting.—The acquiring corporation shall use the method of accounting used by the distributor or transferor corporation on the date of distribution or transfer unless different methods were used by

several distributor or transferor corporations or by a distributor or transferor corporation and the acquiring corporation. If different methods were used, the acquiring corporation shall use the method or combination of methods of computing taxable income adopted pursuant to regulations prescribed by the Secretary.

7. Section 3.02 of Revenue Procedure 71–21, on which RCA relies, provides, in relevant part:
 An accrual method taxpayer who, pursuant to an agreement (written or otherwise), receives a payment in one taxable year for services, where all of the services under such agreement are required by the agreement as it exists at the end of the taxable year of receipt to be performed by him before the end of the next succeeding taxable year, may include such payment in gross income as earned through the performance of the services, . . . .
 Revenue Ruling 71–299 simply states that Revenue Procedure 71–21 supercedes several earlier revenue rulings to the extent that they are inconsistent with the new Revenue Procedure.

also pressed a broader argument that accrual accounting is *never* permissible without express legislative authorization and the Commissioner's consent. In addition, the government contended that RCA was not entitled to a refund because its adoption of the accrual method was a change of accounting methods for which it was required to, but did not, obtain the Commissioner's consent under I.R.C. § 446(e). Finally, the government argued that the regulations promulgated under I.R.C. § 381(c)(4)[8] were inapplicable to the RCA–RCAS merger, and that Rev.Proc. 71–21 and Rev.Rul. 71–299 are not retroactive.

After reviewing the stipulated facts and hearing the testimony of the one live witness, an accounting expert, the district court ruled for RCA. The court read *Michigan, AAA,* and *Schlude, supra,* to proscribe, as "not clearly reflect[ing] income," only those methods of deferring recognition of income that are not based on demonstrably accurate projections of future expenses required to earn the income. In addition, the court expressed its belief in the continued vitality of our decision in *Bressner Radio, Inc. v. Commissioner,* 267 F.2d 520 (2d Cir. 1959), *nonacq.,* Rev.Rul. 60–85, 1960–1 C.B. 181 (1960), decided after *Michigan* but before *AAA* and *Schlude,* in which we held that deferral methods of accounting based upon reasonably accurate estimates of future costs were permissible under I.R.C. § 446. Finding that RCA's accrual method matched service contract revenues and related expenses "with reasonable precision" and therefore "clearly reflect[ed] income," the court held that the Commissioner had abused his discretion under I.R.C. § 446(b) in rejecting RCA's method and imposing on RCA a cash method of accounting.

Alternatively, the district court held that RCA's adoption of its accrual method of accounting was insulated from challenge by

Treas.Reg. § 1.381(c)(4)–1(e) (1964), promulgated pursuant to I.R.C. § 381(c)(4). In addition, the court rejected the government's argument that the Commissioner may disallow any deferred-income method of accounting that is not specifically authorized by statute, and it held that RCA was not barred from seeking a refund by its failure to secure the Commissioner's consent for its adoption of its accrual method. The court found it unnecessary, in view of its disposition of the other issues, to discuss the parties' contentions concerning the retroactivity of Rev.Proc. 71–21 and Rev. Rul. 71–299.

Accordingly, the district court entered judgment for RCA in the amount of $4,627,436.59 for 1958 and $1,328,602.66 for 1959, plus deficiency interest previously assessed against and paid by RCA on those sums, plus statutory interest. This appeal followed.

On appeal, the Commissioner renews the various contentions he pressed at trial, two of which have merit. We conclude that the district court erred in holding, first, that the Commissioner abused his discretion in rejecting RCA's accrual method of accounting for prepaid service contract revenues, and, second, that Treas.Reg. § 1–381(c)(4)–1(e) precluded the Commissioner from challenging RCA's adoption of that method.

## II

This case well illustrates the fundamental tension between the purposes of financial accounting and those of tax accounting. As the Supreme Court has recognized, these two systems of accounting have "vastly different objectives":

The primary goal of financial accounting is to provide useful information to management, shareholders, creditors, and others properly interested; the major re-

---

**8.** Treasury Regulation § 1.381(c)(4)–1(e) provides, in relevant part:

 If the date of distribution or transfer was before August 5, 1964, and if the assessment of any deficiency or the refund or credit of any overpayment for the taxable year of the acquiring corporation which includes the

date of distribution or transfer or any subsequent taxable year is prevented by the operation of [the statute of limitations], then this section does not authorize the Commissioner or the acquiring corporation to change any method or methods of accounting in any taxable year of the acquiring corporation.

sponsibility of the accountant is to protect these parties from being misled. The primary goal of the income tax system, in contrast, is the equitable collection of revenue; the major responsibility of the Internal Revenue Service is to protect the public fisc. Consistently with its goals and responsibilities, financial accounting has as its foundation the principle of conservatism, with its corollary that "possible errors in measurement [should] be in the direction of understatement rather than overstatement of net income and net assets." In view of the Treasury's markedly different goals and responsibilities, understatement of income is not destined to be its guiding light.

*Thor Power Tool Co. v. Commissioner,* 439 U.S. 522, 542, 99 S.Ct. 773, 786, 58 L.Ed.2d 785 (1979) (footnote omitted; brackets in original). The case also highlights the fundamentally different perspective that courts must adopt when reviewing the propriety of an exercise of administrative discretion rather than deciding a naked question of substantive law. We conclude that the district court gave too little weight to the objectives of tax accounting and to the Commissioner's wide discretion in implementing those objectives.

▮▮▮ Section 446 of the Internal Revenue Code of 1954 provides that "[t]axable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books," unless "the method used does not clearly reflect income"; in the latter event "the computation of taxable income shall be made under such method as, in the opinion of the Secretary [of the Treasury], does clearly reflect income." I.R.C. § 446(a), (b). It is well established that the Commissioner enjoys "broad discretion" to determine whether, " 'in [his] opinion,' " a taxpayer's accounting methods clearly reflect income, *Thor Power Tool, supra,* 439 U.S. at 540, 99 S.Ct. at 785 (quoting 26 C.F.R. § 1.446–1(a)(2)), and the Commissioner's exercise of his discretion must be upheld unless it is clearly unlawful:

In construing § 446 and its predecessors, the Court has held that "[t]he Commissioner has broad powers in determining whether accounting methods used by a taxpayer clearly reflect income." *Commissioner v. Hansen,* 360 U.S. 446, 467, 79 S.Ct. 1270, 1281, 3 L.Ed.2d 1360 (1959). Since the Commissioner has "[m]uch latitude for discretion," his interpretation of the statute's clear-reflection standard "should not be interfered with unless clearly unlawful." *Lucas v. American Code Co.,* 280 U.S. 445, 449, 50 S.Ct. 202, 203, 74 L.Ed. 538 (1930).

*Thor Power Tool, supra,* 439 U.S. at 532, 99 S.Ct. at 780; *Lucas v. Kansas City Structural Steel Co.,* 281 U.S. 264, 271, 50 S.Ct. 263, 265, 74 L.Ed. 848 (1930); *Burck v. Commissioner,* 533 F.2d 768, 772–73 (2d Cir. 1976). The task of a reviewing court, therefore, is not to determine whether in its own opinion RCA's method of accounting for prepaid service contract income "clearly reflect[ed] income," but to determine whether there is an adequate basis in law for the Commissioner's conclusion that it did not. Our review of the relevant decisions persuades us that the law adequately supports the Commissioner's action.

In *Michigan, supra,* the first Supreme Court ruling on tax accounting for income received in respect of services to be performed in the future upon demand, the taxpayer received income in the form of prepaid membership dues and promised, in exchange, to perform various services for its members upon demand at any time during the twelve-month term of the membership agreement. In order to match prepaid dues revenues with related expenses, the taxpayer assumed that members would demand services at a constant rate during the contract term and credited prepaid membership dues to current income on a monthly pro rata basis to match the hypothetical rate of demand for services. The Supreme Court upheld the Commissioner's rejection of this method, reasoning that it was "purely artificial and [bore] no relation to the services which [the taxpayer] may in fact be called upon to render." 353 U.S. at 189, 77 S.Ct. at 712.

Not long after *Michigan* was decided, however, this Court, in *Bressner Radio, Inc. v. Commissioner, supra,* upheld a method of deferral accounting for prepaid service contract income that resembled the method rejected in *Michigan.* The taxpayer in *Bressner Radio* contracted to service television sets on demand for a period of one year in exchange for prepayment of a stated fee; the taxpayer recognized 25% of the prepayment as income upon receipt and the remainder over the twelve-month contract term. Although the *Bressner* taxpayer's method of accounting for service contract income was thus nearly identical to that employed by the taxpayer in *Michigan,* this Court distinguished *Michigan,* and ruled for the taxpayer, on the ground that the taxpayer had shown that it experienced "a reasonably uniform demand for services," so that its recognition of income on a pro rata basis predicted its costs of performance with reasonable accuracy and was not "purely artificial" within the meaning of *Michigan.* 267 F.2d at 528–29.

Subsequently, in *AAA, supra,* a Supreme Court case that involved a method of deferring recognition of prepaid membership dues income "substantially identical," 367 U.S. at 691, 81 S.Ct. at 1729, to that employed by the taxpayer in *Michigan,* the taxpayer argued that the Commissioner had abused his discretion in rejecting its deferral method of accounting because it had shown at trial that its method accorded with generally accepted accounting principles and was justified by its past experience in providing services. Despite this showing, the Court upheld the Commissioner's rejection of the method. The Court stated as follows:

> When [the] receipt [of prepaid dues] as earned income is recognized ratably over two calendar years, without regard to correspondingly fixed individual expense or performance justification, but consistently with overall experience, their accounting doubtless presents a rather accurate image of the total financial structure, but fails to respect the criteria of annual tax accounting and may be rejected by the Commissioner.

 * * * * * *

[F]indings merely reflecting statistical computations of average monthly cost per member on a group or pool basis are without determinate significance to our decision that the federal revenue cannot, without legislative consent and over objection of the Commissioner, be made to depend upon average experience in rendering performance and turning a profit.

*Id.* at 692–93, 81 S.Ct. at 1729–30.

Finally, in *Schlude, supra,* the third Supreme Court case on the subject, the taxpayers, operators of a dance studio, contracted with some of their students to provide a specified number of dancing lessons in exchange for a prepaid fee; the lessons were to be given from time to time, as the student specified, during the contract term. For both tax and book accounting purposes, the taxpayers credited contract prepayments to a deferred income account, and then at the end of each fiscal period credited to current income for that period the fraction of the contract price that represented the fraction of the total number of hours of instruction available under the contract that the student had actually used during the period. In addition, if for more than a year a student failed to request any lessons, the taxpayer treated the contract as cancelled and recognized gain to the extent of the amount of the student's prepayment. Despite the fact that the taxpayer's method of accounting was based largely on its actual performance of services during the taxable year, the court upheld the Commissioner's rejection of the method, viewing the case as "squarely controlled" by *AAA,* 372 U.S. at 134, 83 S.Ct. at 604, because the taxpayer was required to perform services under its contracts only at the student's demand, *id.* at 135, 83 S.Ct. at 605.

■ The policy considerations that underlie *Michigan, AAA,* and *Schlude* are quite clear. When a taxpayer receives income in the form of prepayments in respect of services to be performed in the future upon demand, it is impossible for the taxpayer to know, at the outset of the contract

term, the amount of service that his customer will ultimately require, and, consequently, it is impossible for the taxpayer to predict *with certainty* the amount of net income, *i. e.*, the amount of the excess of revenues over expenses of performance, that he will ultimately earn from the contract. For purposes of financial accounting, this uncertainty is tolerable; the financial accountant merely estimates future demands for performance and defers recognition of income accordingly. Tax accounting, however, "can give no quarter to uncertainty." *Thor Power Tool, supra,* 439 U.S. at 543, 99 S.Ct. at 786. The entire process of government depends on the expeditious collection of tax revenues. Tax accounting therefore tends to compute taxable income on the basis of the taxpayer's present ability to pay the tax, as manifested by his current cash flow, without regard to deductions that may later accrue. *See* Silk, *Advance Payments-Prepaid Income: Recent Developments; An Old Problem Put to Rest,* 30 N.Y.U.Inst.Fed.Tax. 1651, 1653–54 (1972). By the same token, tax accounting is necessarily hostile to accounting practices that defer recognition of income, and thus payment of the tax on it, on the basis of estimates and projections that may ultimately prove unsound.

▮ In view of the relevant Supreme Court decisions and the policies they reflect, we cannot say that the Commissioner abused his discretion in rejecting RCA's method of accounting for service contract income. Like the service agreements at issue in *Michigan, AAA,* and *Schlude,* RCA's service contracts obligated it to perform services only upon the customer's demand. Thus, at the beginning of the contract term, RCA could not know the extent of the performance that the customer might ultimately require, and it could not be certain of the amount of income that it would ultimately earn from the contract. The Commissioner was not required to subject the federal revenues to the vicissitudes of RCA customers' future demands for services. Accordingly, he acted within his discretion in requiring RCA to report its prepaid service contract income upon receipt.

RCA's arguments against the Commissioner's exercise of his discretion are unpersuasive. RCA contends principally that its accounting method must be upheld on the basis of our decision in *Bressner Radio, supra,* which, as noted above, upheld an accounting system that was based on reasonably accurate predictions of the demand for services. We think, however, that the Supreme Court's post-*Bressner* decisions in *AAA* and *Schlude* have deprived *Bressner* of controlling force. First, the *AAA* Court seems to have believed that it was overruling *Bressner,* for the Court stated that it had granted certiorari to review the lower court's decision in *AAA* because it perceived "a conflict between" that decision, which the Court affirmed, and our contrary ruling in *Bressner. AAA, supra,* 367 U.S. at 689, 81 S.Ct. at 1728. *See also Automobile Club of New York, Inc. v. Commissioner,* 304 F.2d 781, 786 (2d Cir. 1962) (Clark, J., concurring in the result) (*AAA* contains "quite specific rejection" of *Bressner*); *Hagen Advertising Displays, Inc. v. Commissioner,* 407 F.2d 1105, 1109 (6th Cir. 1969) (*Bressner* rejected in *AAA*); *Franklin Life Insurance Co. v. United States,* 399 F.2d 757, 763 (7th Cir. 1968) (same), *cert. denied,* 393 U.S. 1118, 89 S.Ct. 989, 22 L.Ed.2d 122 (1969). Second, the holdings of *AAA* and *Schlude* are sufficiently contrary to that of *Bressner* that we must regard *Bressner* as invalid even if *AAA* did not expressly overrule it. As *AAA* and *Schlude* make plain, it is not simply the "artificiality" of a taxpayer's method of deferring recognition of income from services performable on demand that offends the clear reflection principle of § 446(b), but rather the uncertainty inherent in any method that relies on prognostications and assumptions about the future demand for services. The method upheld by us in *Bressner* relied on such prognostications as much as did the methods rejected in *AAA* and *Schlude.* Because the latter cases underscore the Commissioner's discretion to disallow accounting methods that subject the federal revenues to such uncertainty, we cannot invoke *Bressner* to invali-

date the Commissioner's exercise of his discretion here.[9]

Equally unpersuasive are RCA's efforts to distinguish *AAA* and *Schlude*. RCA contends that the accounting practices at issue in those cases, which were based on the past demand for services, differ significantly from its own, which was based on relatively scientific projections of the future demand for services, and that its accounting method was valid under *AAA* and *Schlude* even if *Bressner* is disregarded. We think, however, that the differences between RCA's method and the others are immaterial in the present context. As noted above, the vice of the systems treated in *AAA* and *Schlude* was their tendency to subject government revenues to the uncertainties inherent in prognostications about the rate at which customers would demand services in the future. RCA's system shared this vice. Although RCA's predictions may have been more accurate than those of the taxpayers in *AAA* and *Schlude*, they were predictions nonetheless, and the Commissioner was not required to accept them as determinants of the federal revenue.

■ RCA's other arguments on this score require but brief discussion. While the Commissioner has permitted certain forms of accrual accounting in Rev.Proc. 71–21, *supra*, and Rev.Rul. 71–299, *supra*, that does not necessarily mean, as RCA asserts, that the Commissioner has conceded the correctness of RCA's position in this litigation. As we have emphasized above, the Commissioner possesses considerable discretion in these matters, and he was at liberty to alter his stance toward the accounting practices at issue here in light of his greater experience with them and their effect on revenue collection. In addition, although the dis-

trict court found that RCA's accounting practices did "clearly reflect income," we are not bound by that finding under the "clearly erroneous" standard of Fed.R. Civ.P. 52. The issue before the district court was not whether RCA's accounting method adequately reflected income, but whether the Commissioner abused his discretion in determining that it did not. The latter question is one of law, and for the reasons stated above we conclude that the Commissioner did not abuse his discretion.[10]

### III

As an alternate ground for its ruling in favor of RCA, the district court held that Treas.Reg. § 1.381(c)(4)–1(e), *see* note 8, *supra*, which governs the resolution of certain tax accounting problems that may arise in corporate mergers, barred the Commissioner from challenging RCA's adoption of its accrual method of accounting after the liquidation of RCAS in 1957. Section 381(c)(4) of the Internal Revenue Code provides that a corporation that acquires another corporation "shall use the method of accounting used by" the acquired corporation "unless different methods were used" by the two corporations, in which case the acquiring corporation is to use the method required by regulations to be prescribed by the Secretary of the Treasury. As it happened, the Secretary did not prescribe such regulations until 1964, some ten years after § 381 was enacted. The 1964 regulations contained certain "Special Rules" applicable to pre-1964 transactions, one of which provided that "this section does not authorize the Commissioner ... to change any method ... of accounting" adopted by an acquiring corporation in connection with an acquisition made in a taxable year on which the statute of limitations had expired. Treas.

---

9. This does not mean that the Commissioner abused his discretion in promulgating Rev. Proc. 71–21 and Rev.Rul. 71–299, which permit limited use of the accounting methods upheld by us in *Bressner*. As we point out *infra*, the Commissioner has discretion to permit such methods on the basis of increased experience with them and their effect on revenue collection. We here hold only that *Bressner* was mistakenly decided to the extent that it re-

quired the Commissioner to accept a method of accounting that he had discretion to reject.

10. In view of our disposition of this issue, we do not address the government's argument that, absent express legislative authorization and the Commissioner's consent, deferring recognition of income items in accordance with the principles of accrual accounting is never permissible.

**890**

Reg. § 1.381(c)(4)–1(e)(1). Reasoning that RCA and RCAS had employed "different methods" of accounting for prepaid service contract income prior to their merger in 1957, a year on which the statute of limitations had run, the district court held that the Special Rules precluded the Commissioner from challenging RCA's adoption of its accrual method.

 We believe the district court erred; we conclude that RCA stands outside the protection of the Special Rules because its method of accounting did not differ from that of RCAS within the meaning of § 381(c)(4). Regulations promulgated under I.R.C. § 446 define the term "method of accounting" to include "not only the overall method of accounting of the taxpayer but also the accounting treatment of any item." Treas.Reg. § 1.446–1(a)(1960). Given this definition, we must read I.R.C. § 381(c)(4) to require an acquiring corporation to retain an acquired firm's method of accounting with respect to every discrete item of income that the acquired firm received, unless the acquiring firm used a different method with respect to that item. Prior to the 1957 liquidation of RCAS into RCA, the service business was conducted only by RCAS, and RCA did not have service contract income. Until the liquidation therefore, RCA did not have any method of accounting for prepaid service contract income, and it could not have had a method "different" from RCAS's. Accordingly, I.R.C. § 381(c)(4) required RCA to report service contract income on a cash basis, as RCAS had done.

We disagree with RCA's contention that the Special Rules are not premised expressly on the existence of any difference in accounting methods, and that they should be construed to protect not only taxpayers who were uncertain of which method to adopt in the face of a clear conflict between methods, but also those who were uncertain about whether their accounting methods in fact differed from those of an acquired company.[11] Section 381(c)(4) requires that a taxpayer use a method of accounting prescribed by regulations thereunder only if its method of accounting differed from that of the acquired company. The regulations under § 381(c)(4), of which the Special Rules are a part, by their terms do not purport to apply to taxpayers who have acquired companies not using a different method of accounting. Treas.Reg. § 1.381(c)(4)–1(a). We therefore find the Special Rules irrelevant.

 Finally, we conclude that we need not decide whether Rev.Proc. 71–21 and Rev.Rul. 71–299 are retroactive. Both require the taxpayer to obtain the Commissioner's consent before employing the accounting procedures permissible under them. Rev.Proc. 71–21 at § 5.01.[12] RCA has neither sought nor obtained the Commissioner's consent to adopt those procedures. Accordingly, it may not use them even if the Procedure and Ruling are retroactive.

### IV

For the reasons stated above, we reverse the judgment of the district court and remand the matter with instructions to dismiss the complaint.

---

11. We are not convinced that there was any valid basis for the uncertainty RCA claims. The regulation providing that the term "method of accounting" referred to treatments of discrete items was not new to the 1954 Code. A regulation adopted under the 1939 Code stated as follows:

> For the purposes of this section, a change in the method of accounting employed in keeping books means any change in the accounting treatment of items of income or deductions ...

12. Section 5.01 provides:

> Any change by a taxpayer from his present method of including amounts in gross income to the method prescribed in section 3.02 of this Revenue Procedure is a change in method of accounting to which section 446 ... appl[ies].

Section 446(e), quoted in full at note 4, *supra*, provides that a taxpayer wishing to change his accounting method must obtain the consent of the Secretary of the Treasury.