**DANA CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 95–676T.**

United States Court of Federal Claims.

July 15, 1997.

---

Eric R. Fox, Washington, DC, for plaintiff.

G. Robson Stewart, Washington, DC, with whom was Assistant Attorney General Loretta C. Argrett, for defendant. David Gustafson, Assistant Chief Court of Federal Claims Section, Tax Division, of counsel.

## ORDER

MILLER, Judge.

This case comes before the court after argument on the parties' cross-motions for partial summary judgment. The issues are 1) whether plaintiff may deduct as an ordinary and necessary business expense a retainer fee paid to a law firm in 1984 and applied towards services rendered in connection with a subsequently occurring capital acquisition and 2) whether plaintiff's subsidiary, a cash-method taxpayer, may deduct prepayments of interest in the year paid.

## FACTS

The parties provided a Joint Stipulation from which the following facts are drawn. During tax years 1984 and 1985, Dana Cor-

poration ("plaintiff") and its affiliates manufactured and marketed vehicular and industrial components and engaged in leasing and financial services. Plaintiff filed a consolidated return with its domestic subsidiaries and reported its earnings on a calendar year basis.

The Internal Revenue Service (the "IRS") asserted income tax deficiencies against plaintiff for tax years 1984 and 1985. Specifically, the IRS took the position that plaintiff could not deduct a $100,000.00 retainer fee in 1984; that plaintiff's subsidiary, Potomac Leverage Leasing Company ("Leverage Leasing"), could not use the cash method of accounting for 1984 and 1985; and that plaintiff was not entitled to additional foreign tax credits from its Brazilian subsidiaries.[1]

Plaintiff paid the alleged deficiencies and filed a refund claim, which the IRS disallowed on October 20, 1994. Thereafter, on October 12, 1995, plaintiff timely filed its complaint with the Court of Federal Claims, seeking refunds of $3,060,194.00 for 1984 and $278,286.00 for 1985, plus interest. Both parties have moved for summary judgment with respect to the legal retainer fee and the adjustments to Leverage Leasing's tax returns for 1984 and 1985.

1. *Legal fee*

Plaintiff regarded the law firm of Wachtell, Lipton, Rosen and Katz ("Wachtell") as an expert in the field of corporate takeovers. In order to ensure that plaintiff could avail itself of Wachtell's services, and to prevent its competitors from doing the same, plaintiff entered into a retainer agreement with Wachtell. The original retainer agreement took effect in 1976 and was renewed annually through 1991.

Pursuant to the retainer agreement, plaintiff paid Wachtell an annual retainer fee of $35,000.00 for calender years 1976–1983. The amount of the retainer increased to $100,000.00 for calender years 1984–1991. Although plaintiff retained Wachtell for its

expertise in the area of corporate takeovers, and not for general legal services, the retainer agreement permitted plaintiff to employ Wachtell for matters unrelated to takeovers. Plaintiff could offset any charges incurred through the use of Wachtell's services against the retainer fee paid for the corresponding year. Furthermore, Wachtell is the only firm to which plaintiff regularly paid retainers.

In any year during which plaintiff did not utilize Wachtell's services, Wachtell kept the entire amount of the retainer. In 1976, 1985–1988, 1990, and 1991, Wachtell did so while performing minimal or no legal services. In 1978 Wachtell performed legal services for plaintiff pertaining to a proposed acquisition of The Weatherhead Company, totaling $52,230.29. Wachtell credited plaintiff's retainer fee paid earlier that year, thereby reducing the total due to $17,230.29. After an IRS audit, plaintiff deducted the entire retainer fee ($35,000.00), plus an additional $7,230.29. Plaintiff capitalized the remaining $10,000.00 associated with the acquisition cost.

In 1984 plaintiff acquired Warner Electric Brake and Clutch Company ("Warner"), and Wachtell rendered legal services totaling $265,000.00. Wachtell credited the $100,000.00 retainer fee for 1984 to the $265,000.00 legal service fee, which resulted in plaintiffs owing Wachtell $165,000.00. Plaintiff capitalized the $165,000.00 as part of the acquisition cost of Warner and claimed a deduction for the $100,000.00 paid as a retainer. The IRS disallowed the $100,000.00 deduction for the 1984 retainer as a non-deductible cost of the Warner acquisition. However, in each of the preceding years in which retainers were paid and Wachtell rendered negligible legal services, plaintiff claimed a deduction, which was permitted by the IRS. Both parties agree that the 1984 retainer paid to Wachtell would have constituted a proper deduction had it not been credited against the Warner fee. The legal fees paid by plaintiff in connection with the

---

1. During argument the parties stated that the tax credit issue had not been settled, but they currently were discussing it. They were advised that final judgment cannot be entered in a tax case until all issues have been resolved. *See*

*Houston Indus. Inc. v. United States,* 78 F.3d 564, 568 (Fed.Cir.1996) (stating that in tax case final judgment cannot be granted without resolution of all issues, because all issues in single tax years represent one claim).

Warner acquisition were correctly treated as non-deductible capital expenses.

In 1989 Wachtell performed services in the amount of $375,000.00 for plaintiff in the acquisition of The Superior Electric Company; the amount subsequently was reduced by $100,000.00 after deducting the previously paid retainer fee. Plaintiff claimed the $100,000.00 as a deduction on its 1989 tax return. Wachtell later agreed to reduce the fee by an additional $100,000.00 to $175,-000.00, which was capitalized as part of the acquisition cost. The parties are unsure as to the status of the deduction claimed in 1989, but, as of argument, the IRS had not challenged it.

### 2. *Method of accounting*

Plaintiff formed a number of subsidiaries between 1979 and 1983. In 1979 plaintiff formed Diamond Financial Holdings Inc. ("Financial") to act as a holding company for plaintiff's banking, leasing, and financial services companies. Plaintiff formed Potomac Leasing Company ("Potomac Leasing") in 1980, as a subsidiary of Financial, to engage in the leasing of automobiles and other business equipment to plaintiff and other unrelated customers. In 1981 plaintiff formed another Financial subsidiary, Diamond Finance Company ("Diamond"), to act as a borrowing vehicle for the banking, leasing, and financial services activities of Financial and its subsidiaries. Between June 1981 and January 1984, Financial transferred to Diamond all of Potomac Leasing's stock; consequently, Diamond owned Potomac Leasing during 1984 and 1985.

In 1982 Diamond and its subsidiaries had a restrictive agreement (the "Aetna Agreement") with Aetna Life Insurance Company, which required Diamond and the other subsidiaries to be designated restricted subsidiaries and to comply with certain covenants. Plaintiff then formed Leverage Leasing as a wholly-owned subsidiary of Potomac Leasing to handle the types of leverage leasing activities that were likely to place Diamond and the other subsidiaries in violation of the Aetna Agreement. Leverage Leasing was an inactive corporation in 1983 and commenced activity in 1984. When it was formed, Leverage Leasing was aware that many other leasing companies used the cash method of accounting, but no decision had been made as to what method Leverage Leasing would utilize.

Leverage Leasing, Financial, Diamond, Potomac Leasing, and plaintiff filed consolidated federal income tax returns during 1984 and 1985. Leverage Leasing reported its income and deductions using the cash method of accounting, while the other four subsidiaries each reported their incomes and deductions using the accrual method. Leverage Leasing used the cash method solely to obtain various tax benefits. In 1987 Leverage Leasing elected to continue using the cash method of accounting for all lease transactions entered into on or before September 25, 1985, by filing a statement on its 1987 federal income tax return.

Potomac Leasing had a 100% equity interest in its leasing business assets, none of which were pledged as loan collateral. Leverage Leasing, however, acquired, by itself or with unrelated lessors, a multi-million dollar asset subject to non-recourse financing at 70 to 80% of the asset's value and then leased that asset to a third party. Thus, Leverage Leasing pledged part of the asset's value as loan collateral. Leverage Leasing paid the difference between the asset's cost and the borrowed funds with its accumulated earnings and capital, which came from Potomac Leasing's funds or from Diamond's capital.

Leverage Leasing borrowed funds from banks or insurance companies on the security of the leased asset and the rental payments. These rental payments normally were paid to a trustee who held title to the asset, collected the rents, and paid the principal and interest owed to the lenders from Leverage Leasing. The trustee returned the surplus to Leverage Leasing after rents were collected and payments were made to the lender.

In 1984 and 1985, Leverage Leasing was party, either as an original participant or as an assignee from Potomac Leasing, to nine separate leverage leasing contracts with six different lessees. Thus, with respect to at least some obligations, Potomac Leasing,

which uses the accrual method, passed onto Leverage Leasing, which uses the cash method, the obligation to pay interest.

Leverage Leasing was entitled to collect rents in arrears totaling $3,756,326.00 in 1984 and $10,563,619.00 in 1985. During the corresponding periods, Leverage Leasing owed interest in arrears in the amounts of $2,658,156.00 and $10,563,619.00, respectively. In 1984 Leverage Leasing prepaid interest in the amount of $2,151,011.00, and in 1985 it prepaid interest in the amount of $3,099,504.00. Although the interest had economically accrued, Leverage Leasing legally was not obligated to pay it until the following year. In both of these years, Leverage Leasing prepaid the interest solely for the purpose of obtaining the tax deduction in the year paid. It obtained no other benefits from this prepayment. In 1984 Leverage Leasing collected rent in the amount of $3,756,326.00 and deducted interest expense in the amount of $4,809,123.00, and in 1985 Leverage Leasing collected rent totaling $10,767,201.00 and deducted interest expense in the amount of $13,663,123.00. Plaintiff conceded at argument that two of the interest prepayments listed in the original complaint were not validly deductible. *See* Transcript of Proceedings, *Dana Corp. v. United States*, No. 95–676T at 13 (Fed.Cl. June 23, 1997) (hereinafter "Tr.").

The IRS determined that for tax years 1984 and 1985 the cash method of accounting did not clearly reflect Leverage Leasing's income. The IRS accordingly required Leverage Leasing to use the accrual method, rather than the cash method, which increased Leverage Leasing's rental income $3,124,530.00 for 1984 and $4,033,124.00 for 1985. Plaintiff contends that the cash method of accounting properly reported Leverage Leasing's income and deductions for both of the disputed years.

## DISCUSSION

### 1. *Legal fee*

Plaintiff claims that the legal retainer fee paid to Wachtell qualifies as an "ordinary and necessary business expense" properly deductible under 26 U.S.C. ("I.R.C.") § 162(a) (1994). Defendant counters that the retainer fee represents a non-deductible capital expenditure under I.R.C. § 263 because Wachtell credited the legal retainer fee against legal fees associated with a capital acquisition.

I.R.C. § 162(a) permits deductions for "all ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business." I.R.C. § 263, however, prohibits deductions for capital expenditures: "[N]o deduction shall be allowed for any amount paid out for new buildings or for the permanent improvements or betterments made to increase the value of any property or estate." All non-deductible expenses must be capitalized. *Commissioner v. Idaho Power Co.*, 418 U.S. 1, 94 S.Ct. 2757, 41 L.Ed.2d 535 (1974).

The taxpayer has the burden of proving the right to claim a deduction for a specific expense because deductions are a matter of legislative grace. *Interstate Transit Lines v. Commissioner*, 319 U.S. 590, 593, 63 S.Ct. 1279, 1281–82, 87 L.Ed. 1607 (1943) (citing *Deputy v. du Pont*, 308 U.S. 488, 493, 60 S.Ct. 363, 366, 84 L.Ed. 416 (1940)). The question of whether an expense is deductible turns "upon the origin and nature of the claims themselves." *United States v. Gilmore*, 372 U.S. 39, 43–44, 83 S.Ct. 623, 625–26, 9 L.Ed.2d 570 (1963); *see also Woodward v. Commissioner*, 397 U.S. 572, 90 S.Ct. 1302, 25 L.Ed.2d 577 (1970). Under the "origin of the claim doctrine," the court must examine the character of the taxpayer's claim, not plaintiff's motive or primary purpose for the claim. *Woodward*, 397 U.S. at 578, 90 S.Ct. at 1306. In *Gilmore* the Court provided guidelines for interpreting the doctrine: " '[I]t is the origin of the liability out of which the expense accrues' or 'the kind of transaction out of which the obligation arose . . . which is crucial and controlling.' " 372 U.S. at 47–48, 83 S.Ct. at 628 (quoting *Deputy*, 308 U.S. at 494, 496, 60 S.Ct. at 366–67, 367–68). *See generally McKeague v. United States*, 12 Cl.Ct. 671, 675 (1987) ("The object of the 'origin of the claim' test is to find the transaction or activity from which the taxable event approximately resulted, or the event that 'led to the tax dispute.' The origin is

defined by analyzing the facts and determining what the basis of the transaction is, and does not rely on purpose, consequence or result.") (citing *Gilmore*, 372 U.S. at 47, 83 S.Ct. at 628; *Keller Street Dev. Co. v. Commissioner*, 688 F.2d 675, 681 (9th Cir.1982)). While the origin of the claim is not a forward-looking doctrine, *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 112 S.Ct. 1039, 117 L.Ed.2d 226 (1992), the Supreme Court has explained that "a taxpayer's realization of benefits beyond the year in which the expenditure is incurred is undeniably important in determining whether the appropriate tax treatment is immediate deduction or capitalization." *Id.* at 87, 112 S.Ct. at 1044–45.

Defendant contends that plaintiff's application of the legal retainer to the fees associated with a capital acquisition is a non-deductible capital expenditure. Specifically, defendant asserts that "the proper inquiry in determining the origin and character of the legal expense is to examine all the facts surrounding the expense, including an examination of the future aspects of the transaction to which the expenses relate." Def's Br. filed Mar. 10, 1997, at 20. According to defendant, because the "actual transaction" to which the $100,000.00 retainer was later applied was a capital acquisition, the expense automatically is capital in nature.

■ Plaintiff's eight-year history of paying such retainers establishes the retainer for 1984 as an ordinary and necessary business expense as required by I.R.C. § 162(a). Plaintiff paid the legal retainer fee to Wachtell each January beginning in 1976 through 1991. The origin of plaintiffs $100,000.00 claim thus occurred in January of the year paid, not when it was applied to any legal fees. In the instant case, the origin of the claimed $100,000.00 deduction is the payment to Wachtell in January 1984, similar to the practice employed by plaintiff in the previous eight years.

■ A legal retainer guarantees a firm's representation for one year and is earned on receipt. *See generally In re Pannebaker Custom Cabinet Corp.*, 198 B.R. 453, 459 (Bankr.M.D.Pa.1996) (describing retainers). In this case plaintiff paid the retainer to ensure that Wachtell would not represent a hostile company in a takeover attempt. Plaintiff did not realize any "benefits beyond the year in which the expenditure was made" from the $100,000.00 retainer paid in January. *See INDOPCO*, 503 U.S. at 87, 112 S.Ct. at 1044–45. After December 31, 1984, plaintiff did not realize any benefit; in order to ensure Wachtell's services in 1985, plaintiff was required to pay Wachtell another $100,-000.00. The fact that the retainer was later applied to reduce Wachtell's fees associated with a capital acquisition does not relate to the origin of the claimed deduction. The origin of the deduction is the payment in January of 1984, which was continued, as in past years, as a way for plaintiff to defend itself against asset destruction. To hold otherwise would require the court to ignore the Supreme Court's reasoning in *Gilmore* and its progeny and would promote uncertainty as to the deductibility of an ordinary and necessary business expense.

Plaintiff's claim is analogous to the claim made in *Newark Morning Ledger Co. v. United States*, 539 F.2d 929 (3d Cir.1976). The disputed deduction in *Newark* constituted legal fees associated with a derivative share suit brought to protect corporate assets. The taxpayer bought the controlling majority in a newspaper and soon discovered a mismanagement of corporate assets by the minority stockholders who ran the business. The taxpayer then filed a derivative share suit from which a settlement decree arose that did not "provide for [plaintiff's] costs and attorney's fees incurred in the litigation;" therefore, the taxpayer claimed these fees as a deduction under I.R.C. § 162(a). 539 F.2d at 932. Defendant in *Newark* contended that plaintiff's legal fees were capital in nature and arose out of its acquisition of the newspaper and that, consequently, they were not validly deductible. *Id.* at 934. The Third Circuit held that the origin of the disputed claim was the prevention of asset destruction and not an attempt to gain assets, *id.*, so that the expense was properly deductible. The expenditure made by the taxpayer in *Newark* was for asset protection, just as plaintiff's payment of the retainer fee in this case.

Plaintiff did not pay the retainer fee to Wachtell each year in contemplation that it

could use the retainer to convert non-deductible fees into deductible ones. In fact, in most years in which plaintiff paid a retainer fee to Wachtell, plaintiff did not realize any tangible legal benefit from the expenditure. The retainer paid by plaintiff is not a "deposit," as suggested by defendant, because Wachtell earned the fee on receipt, regardless whether Wachtell performed any services in that year.[2] The retainer has its own identity separate and distinct from the work done later in 1984 by Wachtell; the benefit received from the retainer ended on December 31 of that year and would only continue if another retainer was paid.

Defendant contends that acceptance of a retainer fee later applied to services rendered in connection with a capital acquisition could result in gross abuse by taxpayers. Specifically, defendant posits that taxpayers could obtain judicially sanctioned deductions for "illegal bribes and kickbacks." Def's Br. filed Mar. 10, 1997, at 22. Defendant's "cheap scare tactics," Plf's Br. filed Mar. 25, 1997, at 2, are not apt because such payments are illegal on their face irrespective of any tax ramifications. That the possibility of abuse cannot be ruled out is no reason for ignoring the origin of the claim doctrine for legal retainers. Tax auditors can be expected to audit questionable deductions.

During argument defendant offered a comparison between a hypothetical discussed in the Supreme Court's *Gilmore* decision and the case at hand. In the *Gilmore* hypothetical, the Supreme Court states that the use of business assets to satisfy a judgment for a personal auto accident does not change the nature of the judgment from a personal to a business expense. 372 U.S. at 48, 83 S.Ct. at 628–29. Defendant submits that if a taxpayer paid a retainer to a firm for a business purpose and then used the firm for litigation associated with a personal accident, plaintiff's argument would allow the use of the retainer to change the nature of the legal fees incurred from personal to business. Defendant ignores the context in which the payment was made, which it advocated examining earlier, arguing that the court should not examine events prior to the defining transaction. One would expect defendant to take the position that the prior event, the payment of the retainer for business purposes, would not change the nature of the legal fees incurred.

Applying defendant's reasoning to the hypothetical in *Gilmore*, however, defendant would focus on the defining transaction, a business payment for a legal expense and allow the deduction. Defendant would not examine the prior event, a personal automobile accident. Defendant's reasoning fosters arbitrariness and ignores the origin and nature of the claim. In the case at bar, defendant wants to use the nature of the legal fees to change the character of an earlier event, the payment of the legal retainer. The retainer paid by plaintiff has an origin and character distinct from the legal fees later incurred. Similarly, the origin of the retainer in defendant's hypothetical is independent from the legal fees to which it was later applied. Defendant's semantics not withstanding, the controlling test adopted by the Supreme Court in *Gilmore*, *Woodward*, and *INDOPCO*, does not accept a primarily forward looking approach.

■ The court confines its ruling on this issue to the facts of this case and does not hold that a retainer *ipso facto* is deductible. Under the origin of the claim doctrine, the court must examine the totality of the facts and circumstances in determining the origin and character of the claim. *Boagni v. Commissioner*, 59 T.C. 708, 713, 1973 WL 2589 (1973). In the case at bar, plaintiff's established history of paying retainers to Wachtell and the timing of the legal fees incurred are important considerations.

### 2. *Method of accounting*

I.R.C. § 446(b) states: "If no method of accounting has been regularly used by the taxpayer, or if the method used does not

2. Between 1976 and 1983, the only year Wachtell performed any legal services for plaintiff was 1978; in each of the other years, Wachtell kept the entire retainer. In 1978 Wachtell performed legal services in connection with a capital acquisition, and the retainer amount was applied to the fees incurred. The IRS allowed the amount of the retainer to be deducted after completion of an audit. Defendant could not explain the difference in treatment during argument.

clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income." The regulations promulgated in connection with this provision give the Commissioner the power and discretion to determine whether a taxpayer's method of accounting clearly reflects income and whether a new method of accounting should be used to rectify the computation. 26 C.F.R. § 1.446–1(a)(2), (b)(1) (1984).

■ In interpreting this statute and its accompanying regulations, courts give the Commissioner considerable discretion, *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 532, 99 S.Ct. 773, 780–81, 58 L.Ed.2d 785 (1979), and place the burden on the taxpayer to prove the Commissioner's decision represents an abuse of discretion. *Clement v. United States*, 217 Ct.Cl. 495, 510, 580 F.2d 422, 430 (1978). "It is well established that the Commissioner enjoys 'broad discretion' to determine whether, 'in his opinion' a taxpayer's accounting methods clearly reflect income, *Thor*, 439 U.S. at 540, 99 S.Ct. at 785 (quoting 26 C.F.R. § 1.446–1(a)(2)), and the Commissioner's exercise of his discretion must be upheld unless it is clearly unlawful...." *RCA Corp. v. United States*, 664 F.2d 881, 886 (2d Cir.1981) (citing *Thor*, 439

U.S. at 532, 99 S.Ct. at 780–81; *Lucas v. Kansas City Structural Steel Co.*, 281 U.S. 264, 271, 50 S.Ct. 263, 265–66, 74 L.Ed. 848 (1930); *Burck v. Commissioner*, 533 F.2d 768, 772–73 (2d Cir.1976)). Thus, the court must examine whether the Commissioner abused his discretion in determining that Leverage Leasing's income was not clearly reflected on its 1984 and 1985 income tax returns using the cash method of accounting and in choosing an alternate method, the accrual method of accounting.[3] *See RCA*, 664 F.2d at 886 ("The task of the reviewing court, therefore, is not to determine whether in its own opinion [plaintiff's] method of accounting ... clearly reflected income ...."). In examining whether the Commissioner abused the discretion granted in I.R.C. § 446, the court will "determine whether there is an adequate basis in law" for the Commissioner's decision that plaintiff's use of the cash method in 1984 and 1985 did not clearly reflect income. *Id.*

■ During argument plaintiff agreed that the issue to be determined is whether the Commissioner acted arbitrarily in making his determination and that it is plaintiff's "heavy burden" to so demonstrate. *See* Tr. at 5, 7. In order to satisfy this heavy burden, plaintiff must show that the Commissioner incorrectly determined that plaintiff's income was not clearly reflected.[4] *Grynberg v. Commis-*

---

3. Plaintiff cites *Travelers Ins. Co. v. United States*, 35 Fed. Cl. 138 (1996), and *Mulholland v. United States*, 28 Fed. Cl. 320 (1993), aff'd mem., 22 F.3d 1105 (Fed.Cir.1994) (Table), as the basis for its assertion that the court should review de novo the issue of whether plaintiff's method of accounting clearly reflected income in 1984 and 1985. This standard of review, cited by *Travelers* and *Mulholland*, is improper in the context of this case and countermands established precedent in this area.

In *Travelers* the court cites *Mulholland* as the basis for its determination that "[w]hen the dispute centers on the accuracy of a taxpayer's method of accounting, ... the court must review the evidence to determine whether or not, as initially applied, the method clearly reflects income." 35 Fed. Cl. at 141 (citing *Mulholland*, 28 Fed. Cl. at 334). *Mulholland* is incorrect that a de novo standard of review extends to making findings as to whether or not a taxpayer's method of accounting clearly reflects income. It does not. Rather, the court examines de novo the Commissioner's exercise of discretion in making that determination. It should be noted that the affirmance of *Mulholland* was not published, is

not citable as precedent, and in no way confirms the formulation of de novo review in the lower court's opinion.

Specifically, *Mulholland* incorrectly represents that *Warren Corp. v. United States*, 135 Ct.Cl. 305, 141 F.Supp. 935 (1956), advocates a de novo standard of review. The Court of Claims in *Warren* held that court would not be limited to a de novo review of the facts presented to the Commissioner at the time of the IRS' review, but would start from a clean record and additional evidence could be presented. 135 Ct.Cl. at 313–14, 141 F.Supp. at 940 ("The defendant argues that the question of whether the Commissioner of Internal Revenue abused his discretion should be decided on the 'record' made before him rather than on the record made before this court. The tax laws contemplate a trial de novo ....").

4. Defendant contends that plaintiff must satisfy the three-part test in *Clement v. United States*, 217 Ct.Cl. 495, 580 F.2d 422 (1978), in order for its voluntary prepayments to be deductible. For a prepayment to be deductible under this standard, the test requires that it meet three independent conditions: 1) it must be a payment, rather

*sioner,* 83 T.C. 255, 267, 1984 WL 15605 (1984). The court will not interfere with the Commissioner's determination unless it is shown to be "clearly unlawful." *RLC Indus.v. Commissioner.,* 98 T.C. 457, 491, 1992 WL 80336 (1992) (citing *Thor,* 439 U.S. at 532, 99 S.Ct. at 780–81).

■ While conceding that there was complete mismatching between the rents received and the interest payments made, plaintiff argues that the Commissioner only chose a method that more clearly reflected the taxpayer's income. If plaintiff's characterization is correct, the Commissioner acted impermissibly under *Ansley–Sheppard–Burgess Co. v. Commissioner,* 104 T.C. 367, 1995 WL 131530 (1995), which states: "[T]he Commissioner cannot require a taxpayer to change from an accounting method which clearly reflects its income to an alternate method of accounting merely because the Commissioner considers the alternate method to more clearly reflect the taxpayer's income." *Id.* at 371. Plaintiff argues that its use of the cash method of accounting does clearly reflect income as required by I.R.C. § 446(b). Furthermore, plaintiff asserts that because Congress allowed taxpayers to use the cash method and some level of distortion was expected with this method, the IRS cannot now assert that the cash method does not clearly reflect income based on a mere distortion.

■ A taxpayer's use of an accepted method of accounting, commonly used in the taxpayer's line of business, does not place that taxpayer outside the scope of the Commissioner's scrutiny if the income was not clearly reflected by the method chosen in a particular year. *Clement,* 217 Ct.Cl. at 510, 580 F.2d at 430 (citing *American Automobile Ass'n v. United States,* 367 U.S. 687, 692, 695, 81 S.Ct. 1727, 1729–30, 1731, 6 L.Ed.2d 1109 (1961)). Plaintiff is correct that some mismatching is acceptable for taxpayers using the cash method of accounting; it is a

natural occurrence with the cash method that is expected to balance over time. *Ansley–Sheppard,* 104 T.C. at 374 (citing *Van Raden v. Commissioner,* 71 T.C. 1083, 1104, 1979 WL 3605 (1979), *aff'd* 650 F.2d 1046 (9th Cir.1981)). A 100% mismatching between income and interest payments, as conceded by plaintiff, does not clearly reflect income.

Plaintiff asked the court to consider the reasoning established in Priv. Ltr. Rul. 97–25–006 (Feb. 7, 1997). Even if the reasoning in this Private Letter Ruling were considered analogous to the case a hand, which it is not, the letter works against plaintiff's position. Priv. Ltr. Rul. 97–25–006 states that "the cash method will generally clearly reflect the taxpayer's income unless the taxpayer is manipulating the method and such manipulation results in a material distortion of income." The IRS fails to define "manipulation," but the court must conclude that a 100% mismatching of income and deductions solely for tax purposes, in amounts which Leverage Leasing can change each year to meet its needs, is manipulation at some level. The focus of plaintiff's contention is that plaintiff's subsidiary's pre-payment of interest did not result in a material distortion of income for the years 1984 and 1985.

Plaintiff's primary argument relies on three cases that allowed small amounts of prepaid interest to be deducted in the year in which each had economically accrued. *Anderson v. Commissioner,* 568 F.2d 386 (5th Cir.1978); *Burck,* 533 F.2d 768; *Ferrill v. Commissioner,* 39 T.C.M. (CCH) 715 (1979). Unlike Leverage Leasing, whose subsidiary admittedly prepaid the interest solely for the tax benefit, the taxpayer in each of the three cases was an individual, one who prepaid the interest to try and "normalize" his income for that year, *Burck,* 533 F.2d at 771, and another who did so to fix the rate of interest on the loan, *Ferrill,* 39 T.C.M. at 717.[5]

than a deposit; 2) it must be made for a valid business reason and not solely for tax benefit; and 3) it must not cause a material distortion of income. *See id.* at 503, 580 F.2d 422. The analysis used by the court incorporates the third part of the test used in *Clement.* Plaintiff failed

to meet its burden of establishing that the Commissioner acted arbitrarily, so that it is unnecessary to determine whether *Clement's* alternative test applies to this case.

**5.** The third case, *Anderson,* only referred to the taxpayer's claim that he was obliged contractual-

■ Another factor that distinguishes these cases is the amount of money at issue. In plaintiff's cases the Commissioner only allowed a deduction for the few days of interest that had economically accrued.[6] *Burck,* 533 F.2d at 769; *Anderson,* 568 F.2d at 389; *Ferrill,* 39 T.C.M. at 720. The amounts allowed to be deducted in each of these situations were less than $2,500.00,[7] which, even given the approximately ten years difference in the dates of the deductions taken, is a far cry from the prepaid interest amounts of $2,151,011.00 for 1984 and $3,099,504.00 for 1985 sought to be deducted here. The amounts and the reasons behind the deductions should factor into the analysis of whether plaintiff's income was clearly reflected. *Ferrill,* 39 T.C.M. at 719 ("Some of the factors to be considered in determining whether the deduction of prepaid interest gives rise to a material distortion of income include but are not limited to the amount of income in the taxable year of payment, the amount of prepaid interest, the time of payment the reason for prepayment. . . ." (citing Rev. Rul. 68–643, 1968–2 C.B. 76)).[8]

Furthermore, in *Burck, Anderson,* and *Ferrill,* the income relating to the interest payment had not been earned, and it was uncertain when the income would be realized.[9] *See Anderson,* 568 F.2d at 387 (investing in land); *Ferrill,* 39 T.C.M. at 716–17 (investing in future restaurant business). In the case at bar, both the rent and the interest were paid in arrears, so Leverage Leasing purposely could separate the interest payments from the rent and still know how much was coming in. While taxpayers in the other cases were unable to ascertain exactly when and how much income related to the interest payments they would receive, Leverage Leasing knew how much money it would receive as income.

The Ninth Circuit in *Bonaire Dev. Co. v. Commissioner,* 679 F.2d 159, 161 (9th Cir. 1982), concluded that a legal obligation to pay must arise prior to taking a deduction for an ordinary and necessary business expense. The court reasoned: "[T]he voluntary prepayments here contain an element of distortion not inherent in the cash method itself; the unilateral timing of deductions presents no assurance that reporting and the synchronization of expenses with income will be consistent from year to year." *Id.* at 163. In the instant case, plaintiff admitted that at the time Leverage Leasing made the pre-payment, it had no legal obligation to do so. Thus, under plaintiff's argument, each year, upon assessment of its possible tax liability, Leverage Leasing is able to prepay the amount it found most beneficial to offset its income. Even in the two years under examination, the amount of the prepayments was noticeably different. Consequently, under the cash method of accounting, Leverage Leasing's voluntary prepayments do not clearly reflect income and result in a material distortion for the years involved.

Plaintiff has failed to meet its burden of showing that Leverage Leasing's income was clearly reflected in 1984 and 1985 using the cash method of accounting and that the Commissioner acted arbitrarily in deciding otherwise. This court upholds the Commissioner's

ly to prepay. The court did not accept this justification. *See* 568 F.2d at 387, 390.

6. Plaintiff's notion that all prepayments of interest that have economically accrued are deductible is advantageous to plaintiff, given the fact that Leverage Leasing utilizes a system whereby all of its interest is paid in arrears. Under its approach that economic accrual is the only requirement for deductions of prepaid interest, Leverage Leasing can prepay whatever amount it needs to increase deductions and offset income earned in any particular year.

7. This amount was calculated by using the figures provided in each of the three cases and computing the percentage attributable to the two or three days the Commissioner allowed to be deducted.

8. The court in *Ferrill* noted that the position taken in the Revenue Ruling was not binding on the court, but that it is useful in establishing a "guideline of factors which may be considered in determining whether the prepayment of interest in a particular case results in the material distortion of income under § 446(b)." *Ferrill,* 39 T.C.M. at 719 (citing *Burck v. C.I.R.,* 63 T.C. 556, 561–62, 1975 WL 3108).

9. Plaintiff's prepayments of the interest can be directly related to rent received in the following year, which was not the situation in the three cases.

adjustments under I.R.C. § 446(b) to clearly reflect Leverage Leasing's income.

■ Plaintiff asked the court, if it found against plaintiff on this issue, to order that the deductions be disallowed in the year taken and applied in the appropriate year, but not to uphold the Commissioner's decision that Leverage Leasing use the accrual method of accounting. Plaintiff failed to show that the Commissioner's decision was "clearly unlawful" or arbitrary when exercising the discretion granted in I.R.C. § 446(b). The court's role in reviewing the Commissioner's decision is limited. Having found that the Commissioner's actions were neither arbitrary not capricious, the court does not have the power to direct the Commissioner how to exercise the discretion granted by I.R.C. § 446(b). *See Lucas v. American Code Co.,* 280 U.S. 445, 449, 50 S.Ct. 202, 203, 74 L.Ed. 538 (1930).

## CONCLUSION

Accordingly, based on the foregoing,

IT IS ORDERED, as follows:

1. Plaintiff's motion for partial summary judgment is granted as to the deductibility of the legal retainer in 1984, and defendant's cross-motion for summary judgment is denied. As to the method of accounting used in 1984 and 1985, defendant's motion for summary judgment is granted, and plaintiff's motion for partial summary judgment is denied.

2. By August 20, 1997, the parties shall file a Joint Status Report reporting on their progress in resolving informally the remaining issues and in filing a stipulation reflecting the amount of refund due plaintiff.