Barbra L. WELLS, As Next Friend
for Daniel J. Wells, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 98–850C.

United States Court of Federal Claims.

March 16, 2000.

James A. Endicott, Jr., Harker Heights, Texas, for the plaintiff.

Wanda Rubianes–Collazo, U.S. Department of Justice, Washington, D.C., with whom was Acting Assistant Attorney General David W. Ogden, for the defendant.

## OPINION

ALLEGRA, Judge.

This military pay case is before the court on defendant's motion for judgment on the administrative record. Plaintiff's spouse is a former sergeant in the United States Army who received severe and permanent injuries in a car accident. The Army determined that the accident was the result of voluntary intoxication and denied plaintiff's spouse disability retirement and benefits. Plaintiff alleges that this determination was arbitrary and capricious and not in accordance with military regulations. Plaintiff, on behalf of her husband, seeks disability retirement pay with benefits, as well as amendment of his military records to reflect that his injuries

occurred in the line of duty (LOD). Defendant counters that plaintiff has failed to establish any procedural errors and that the Army's decision was based on substantial evidence and not arbitrary and capricious.

## I.  Factual Background

Daniel J. Wells enlisted in the Army on April 3, 1991, and was promoted to staff sergeant in December of 1992. On April 12, 1995, while traveling from Fort Hood, Texas, to a temporary duty assignment at Fort McClellan, Alabama, Sgt. Wells was involved in a head-on collision with a tractor trailer-truck on Interstate 20. At the time of the accident, he was traveling west in an east bound lane. At the point of the accident, and in the immediate surrounding area, Interstate 20 is a divided, four-lane highway, with two lanes traveling in each direction. State Trooper Corporal Joe Nelson responded to the accident. Based on accounts from the driver of the truck, as well as two other listed witnesses, Trooper Nelson prepared a Mississippi Uniform Accident Report that described the accident. He indicated in that report that Sgt. Wells was "obviously intoxicated." The accident report further reflects that a blood alcohol test was administered to Sgt. Wells and that the result of that test indicated that he had a blood alcohol content of 0.235 percent. The officer issued Mr. Wells a citation for driving under the influence; this charge was later dropped.

Sgt. Wells initially received emergency medical attention at Newton Regional Hospital (Newton) in Newton, Mississippi, and was later transferred to Jeff Anderson Hospital (Anderson) in Meridian, Mississippi. The medical records reflecting his care at the Newton emergency room contain some illegible writing, but in a typewritten statement indicate that "had ETOH beverages in small car" and "strong smell ETOH." Neither these records nor those from Anderson include any lab report or slip indicating the results of any blood alcohol test conducted at either hospital, and the administrative record contains no other medical records or lab slips verifying the original results of such a test.[1]

---

1.  Plaintiff's blood alcohol level is also reflected in  a Statement of Medical Examination and Duty

As a result of the injuries he sustained in the accident, Sgt. Wells was deemed to be 80 percent disabled by an Army Physical Evaluation Board. A formal line of duty investigation ensued.[2] On April 14, 1995, Lieutenant Robert Williams was appointed as line of duty (LDI) investigating officer (IO) to determine if Sgt. Wells' injuries were incurred in the line of duty. Lt. Williams conducted an investigation and determined that Sgt. Wells' injuries were caused by his own voluntary intoxication and thus were attributable to misconduct. Lt. Williams relied upon the Mississippi Uniform Accident Report; the personal observations of Lt. John Cushing, who had observed the accident scene; and the statements of Mrs. Wells. Lt. Williams neither obtained the actual results of the blood alcohol test, nor the statements of the truck driver and the state trooper involved with the accident.[3] Believing he had adequate evidence to support a finding of misconduct, Lt. Williams made no attempt to interview and obtain statements from other individuals possessing personal knowledge regarding the accident, including the two witnesses to the accident listed on the police report; the emergency personnel who treated Sgt. Wells at the accident; and the emergency personnel at Newton and Anderson.

Sgt. Wells appealed the findings of the LDI to the Commander of the United States Total Army Personnel Command (PERS-COM). That appeal was denied on February 26, 1997, and Sgt. Wells subsequently applied to the Army Board for the Correction of Military Records (ABCMR) seeking to have his injury classified in the line of duty. The ABCMR denied plaintiff's application on July 30, 1997, concluding that "[t]he not in line of duty, due to own misconduct finding was proper and in accordance with the provisions of the regulation." On November 6, 1998, plaintiff filed a complaint in this court seeking back disability retirement pay, correction of his military records to reflect that his accident occurred in the line of duty, medical expenses and costs and attorney's fees. On July 30, 1999, defendant filed a motion for judgment on the administrative record pursuant to RCFC 56.1.

## II. Discussion

### A. Legal Framework

The Tucker Act, 28 U.S.C. § 1491, authorizes suits in the Claims Court where a claim against the United States is founded on a statute mandating compensation by the government. *United States v. Testan*, 424 U.S. 392, 401–02, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). Pursuant to 10 U.S.C. § 1201, the Secretary of the Army may retire a service member for any disability which did not result from his own misconduct or willful neglect and order that he receive retired pay. This statute is money-mandating and thus provides a basis for jurisdiction under the Tucker Act. *Schwartz v. United States*, 26 Cl.Ct. 992, 995 (1992). To provide complete relief to a plaintiff entitled to a money judgment, the Tucker Act further provides that "the court may, as an incident of and collateral to any such judgment, issue orders directing the restoration of [plaintiff] to office or position, placement in appropriate duty or retirement status, and correction of applicable records." 28 U.S.C. § 1491(a)(2); *Voge*

---

Status (DA Form 2173), dated April 13, 1995. The entry is handwritten in the portion of the report to be prepared by the medical officer. At oral argument, defendant's counsel admitted that the alcohol level on this form was not taken from hospital records, but rather was taken from the police report and added to the form at a later date.

2. Before a member on active duty who sustains permanent injury is eligible to receive disability compensation, a line of duty investigation must be conducted. 10 U.S.C. §§ 1201(b)(2) and (b)(3)(B)(iv). There are three types of line of duty determinations in investigations: presumptive line of duty investigations, informal line of duty investigations, and formal line of duty investigations. Army Regulations (AR) 600–33, ¶ 3–1. An informal LDI is conducted either when there is no indication of misconduct or negligence, or prior to a formal LDI. AR 600–8–1, ¶ 39–2(c). A formal LDI is made when misconduct is suspected or where alcohol is involved. AR 600–33, ¶ 3–1; *see generally Renicker v. United States*, 17 Cl.Ct. 611, 615 (1989).

3. The record reflects that approximately 11 months after the accident, after Sgt. Wells contested the line of duty determination, the IO and representatives of the ABCMR made several attempts to obtain the original blood test results and to interview the truck driver and state trooper. Without any elucidation, the record further indicates that such attempts proved unsuccessful.

*v. United States,* 844 F.2d 776, 781 (Fed. Cir.), *cert. denied,* 488 U.S. 941, 109 S.Ct. 365, 102 L.Ed.2d 355 (1988).

Motions for judgment on the administrative record are reviewed under the same standards as motions for summary judgment. *See* RCFC 56.1(a); *Hoskins v. United States,* 40 Fed.Cl. 259, 270 (1998). Summary judgment is an integral part of the federal rules; it is designed "to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1). Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56 & 56.1; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Disputes over facts that are not outcome-determinative under the governing law will not preclude the entry of summary judgment. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. However, summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Id.*[4] When reaching a summary judgment determination, a judge's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. *See also Agosto v. INS,* 436 U.S. 748, 756, 98 S.Ct. 2081, 56 L.Ed.2d 677 (1978) ("[A] [trial] court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented"). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or wheth-

er it is so one-sided that one party must prevail as a matter of law. *Anderson,* 477 U.S. at 250–52, 106 S.Ct. 2505. In doing this, all facts must be construed in a light most favorable to the nonmoving party and all inferences drawn from the evidence must be viewed in the light most favorable to the party opposing the motion. *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (citing *United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)).

■ "In the instant case, the court is reviewing plaintiff's separation from active service without military disability benefits 'through the prism of a correction board.'" *Renicker v. United States,* 17 Cl.Ct. 611, 614 (1989) (quoting *Cohn v. United States,* 15 Cl.Ct. 778, 789 (1988)). Plaintiff is bound by defendant's decision unless he can show that "the [ABCMR] decision was illegal because it was arbitrary, or capricious, or in bad faith, or unsupported by substantial evidence, or contrary to law, regulation, or mandatory published procedure of a substantive nature by which plaintiff has been seriously prejudiced, and money is due." *Sanders v. United States,* 219 Ct.Cl. 285, 594 F.2d 804, 811 (1979). The court's review under this exceedingly narrow standard of review is not meant to usurp the administrative function.[5] Therefore, this court will "not substitute [its] judgment for the board's when reasonable minds could reach differing conclusions." *Sanders,* 594 F.2d at 814. Nonetheless-

> If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the

---

4. *See also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *California ex rel. Dept. of Transp. v. United States,* 27 Fed.Cl. 130, 135 (1992), *aff'd,* 11 F.3d 1071 (Fed.Cir.1993).

5. Regarding this standard, which is drawn from the Administrative Procedures Act (APA), 5 U.S.C. §§ 701–706 (1994), the Supreme Court has stated:

> Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the deci-

sion was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (citations omitted). *See also Honeywell, Inc. v. United States,* 870 F.2d 644, 647–48 (Fed. Cir.1989); *Blount, Inc. v. United States,* 22 Cl.Ct. 221, 227 & n. 7 (1990).

basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.

*Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985). *See also Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *Schwartz,* 26 Cl.Ct. at 995. Thus, a court may overturn an agency decision if it "becomes aware ... that the agency has not really taken a 'hard look' at the salient problems, and has not genuinely engaged in reasoned decision-making." *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 851 (D.C.Cir.1970), *cert. denied sub nom, WHDH, Inc. v. FCC,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701(1971).

### B. The Process for Making Line of Duty Decisions [6]

■ The Secretary may retire a service member with disability retirement and benefits, computed under 10 U.S.C. § 1401, if he is unable to perform the duties of his office, grade, rank or rating because of a physical disability incurred in the line of duty while he is on active duty. However, a disability resulting from the "member's intentional misconduct or willful neglect" is not considered to be incurred in the line of duty. 10 U.S.C. § 1201(b)(2). *See also* AR 600–8–1, ¶ 37–3(d). A service member whose injuries are the result of his own misconduct is not entitled to disability benefits; such conduct precludes a finding that his injuries were incurred in the line of duty. 10 U.S.C. § 1201(b)(2). Unless refuted by substantial evidence, a service member's injury is presumed to occur in the line of duty. AR 600–8–1, ¶ 39–5(b)–(c). To constitute substantial evidence, the evidence must establish a degree of certainty by a preponderance of the evidence, so that a "reasonable person is convinced of the truth or falseness of a fact." *Id.* at ¶ 39–5(c).

Although intentional misconduct is not defined by statute, the Army has established

guidelines for making line of duty determinations. Thus, "[s]imple or ordinary negligence or carelessness, standing alone, does not constitute misconduct," AR 600–8–1, ¶ 39–5(a), and even the violation of civil or criminal laws, if there is no further sign of misconduct, is only simple negligence, not misconduct, *Id.* at app. F, rule 2. Similarly, consumption of alcoholic beverages does not, in itself, constitute misconduct. *Id.* at app. F, rule 4. However, "[a]ny erratic or reckless conduct caused by the effect of [alcoholic beverages], which directly causes [a service member's] injury ... is misconduct." *Id.* at app. F, rule 3. Thus, misconduct can be found where a service member drives a vehicle when in an unfit condition, such as when he is voluntarily intoxicated. *Id.* at app. F., rule 8. Regarding this situation, the regulations further provide that "[i]n order for intoxication alone to be the basis for a determination of misconduct with respect to a related injury, there must be a clear showing that the member's physical or mental faculties were impaired due to intoxication at the time of the injury, the extent of the impairment, and that the impairment was a proximate cause of the injury." AR 600–8–1, ¶ 41–10(b).

The Army regulations define the types of evidence that should be obtained to support a finding that an injury was not in the line of duty, including "copies of military or civilian police reports" and "pertinent hospitalization or clinical records." AR 600–8–1, ¶ 40–8(e)(1)(c). In instances involving intoxication, that evidence should also include:

> evidence regarding the state of intoxication and the extent of impairment of the physical or mental faculties of any person involved and connected with the incident. Evidence as to the general appearance and behavior, clear and rational speech, coordination of muscular effort, and all other facts, observations, and opinions of others bearing on the question of actual impairment shall be made to determine the quantity and nature of the intoxicating agent used and the period of time over which used by the person. Results of any blood,

---

**6.** This portion of the opinion draws on the excellent summary of LOD procedures contained in

*Schwartz,* 26 Cl.Ct. at 996–97.

breath, urine, or tissue tests for the intoxicating agent should also be obtained and submitted as exhibits (actual lab slip if possible). *Id.* at ¶ 40–8I(e)(2)(g). In addition, the regulations indicate that "[o]ral or written accounts of matters within the personal knowledge of individuals usually constitute an indispensable part of the evidence considered in an investigation." *Id.* at ¶ 41–15.

The IO must ensure that the appointing, reviewing, and final approving authorities are presented with enough pertinent information and data to enable their reviews to be made without additional information. *Id.* at ¶ 40–8(e)(1). In performing the LDI, the IO must make findings of fact and append the appropriate statements and documents to the report to support the findings. *Id.* at ¶ 39–4. All findings must be supported by evidential exhibits. *Id.* at ¶ 40–8(e)(2). Written statements by the IO describing matters personally observed and learned by him should be attached where appropriate; however, "a statement by the IO should not be used as a substitute for witness statements when such can be obtained." *Id.* Also, the LDI report must include a summary of circumstances and the basis for such findings, reasons for not interviewing the person whose line of duty status is being investigated or any witness whose testimony may be material, comments of the IO on the credibility of statements of witnesses, and a list of exhibits. *Id.* at ¶ 40–8(f)(3)(a).

The IO makes the initial LOD determination and then forwards the determination and LDI report to the appointing authority for review. *Id.* at ¶¶ 39–4, 40–9(a). The appointing authority, in turn, refers the report of investigation to the servicing judge advocate for legal review and opinion by a judge advocate or licensed attorney. *Id.* at ¶ 40–9(b). The judge advocate determines whether legal requirements were complied with, ascertains whether any errors committed during the investigation result in material error, and determines whether the findings of the investigation are supported by substantial evidence. *Id.* at ¶ 40–9(b)(1)–(3). On completing its review, the judge advocate sends the results to the appointing authority. In addition to considering the legal opinions of the judge advocate, the appointing authority reviews the LDI for completeness and accuracy. *Id.* at ¶ 40–9(a). After reviewing the legal analysis and the LDI report, the appointing authority approves or disapproves the report. *Id.* at ¶ 40–9(c). The report is then forwarded to a "reviewing authority" and from there, to a "final approving authority." *Id.* at ¶¶ 40–10(a) and 40–11(a). The final approving authority either approves or disapproves of the findings of the lower headquarters "By Authority of the Secretary of the Army." *Id.* at ¶ 40–11. Various appeals are provided, permitting the soldier to contest the LDI findings and to offer new evidence. *Id.* at ¶ 41–16.

## C. Did the Army Comply with Its Line of Duty Investigation Regulations?

Since intentional misconduct prevents a service member from receiving considerable benefits, the Army Regulations emphasize that "it is critical that the decision to categorize [an] injury ... as not in the line of duty only be made after the deliberated and ordered procedures described in this regulation are followed." AR 600–8–1 at ¶ 39–1.[7] Accordingly, as defendant admits, the regulatory provisions described above are a "mandatory published procedure of a substantive nature," binding upon the Army. *Sanders,* 594 F.2d at 811. This court thus may overturn and remand the ABCMR's decision if it is based upon an investigation that materially violated these regulations in a fashion that prejudiced the plaintiff. *Renicker,* 17 Cl.Ct. at 614. Based on its careful review of the administrative record, the court concludes that the Army did not comply with these regulations in the instant case in several major and prejudicial regards.

First, the IO did not obtain critical medical records documenting the original results of

7. *See* Major Block, *Line of Duty—How Strong is the Presumption of "In Line of Duty,"* 1995–MAY Army Law. 66, 67 ("Line of duty determinations can significantly affect the interests of the individual concerned. Due process rights provided to the individual by regulation must be afforded, and investigations should be complete.")

the plaintiff's blood alcohol test and failed to corroborate second-hand accounts of those results. The Army regulations are replete with references emphasizing the importance of documenting intoxication by obtaining appropriate medical records. For example, paragraph 40-8(g) of AR 600-8-1 states that "results of any blood, breath, urine, or tissue tests for the intoxicating agent should also be obtained and submitted as exhibits (actual lab slip if possible)." Other regulations similarly provide that copies of pertinent hospitalization or clinical records "shall" or "should be attached as exhibits." AR 600-8-1, ¶¶ 40-3(b), 40-8(e)(2)(c). In the instant case, a blood alcohol test was apparently ordered and the result—0.235 percent—is recorded on the accident report. However, the administrative record reveals that the IO did not attempt to obtain the lab slip or other original medical records documenting the results of the blood alcohol test until more than 11 months after the accident, at which point his report summarily indicates that "attempts to locate the slip were unsuccessful." [8] No explanation is given as to why these critical records were not sought earlier and defendant's blithe post hoc explanation before this court—that Sgt. Wells never provided an appropriate release—is belied by defendant's admission that there is nothing in the record suggesting that the Army ever sought such a release.[9]

The IO compounded his failure to obtain original records authenticating the blood alcohol level by also failing to obtain a statement from the state trooper documenting the result listed in the trooper's accident report. Without this trooper's statement, there is nothing in the administrative record to indicate how (e.g., orally or in writing) and from whom the state trooper obtained the blood alcohol level listed in his report. And without such a statement, there is also no indication as to who ordered this test,[10] what type of test was performed, how long after the accident the blood was drawn and what procedures were employed to ensure the reliability of the test results. See Schwartz, 26 Cl.Ct. at 999 (raising questions about blood alcohol test results in a similar case).[11] Absent some statement from the state trooper corroborating the result, the bare reference to the blood alcohol level in his report is unsupported hearsay and provides no basis for this court to ignore the IO's critical failure to obtain medical records to support his report, as plainly required by the Army's regulations.[12]

Indeed, although the Army regulations state that "[o]ral or written accounts of matters within the personal knowledge of individuals usually constitute an indispensable part of the evidence considered in an investigation," AR 600-8-1, ¶ 41-15, the IO failed to obtain statements from any witnesses who observed either the accident or Sgt. Wells' physical state thereafter—not from the state trooper, nor the truck driver involved in the

---

8. That these missing medical records were important is highlighted by the memoranda and e-mails in the record from reviewing officials seeking to obtain them. The reviewing officials, however, ultimately concluded—in this court's view, erroneously—that, consistent with the regulations, the LDI determination could be processed without this information.

9. Notably, the Army regulations provide that if an IO is experiencing difficulty in obtaining medical reports the "IO should request that military authorities obtain this information for him or her" and may seek support from the supporting Judge Advocate General office. AR 600-8-1 at ¶¶ 41-5, 41-6. Defendant, however, admits that no such requests were made in the instant case.

10. The ABCMR and various reviewing officials concluded that the state trooper ordered the test, but there is no evidence to this effect in the record.

11. For an indication as to some of the issues that can arise with respect to the handling of a blood alcohol analysis see Lawrence Taylor, Drunk Driving Defense 517-53 (5th ed.2000).

12. That the failure to obtain these records was prejudicial is evidenced by the importance the IO, the reviewing officials and the ABCMR all ascribed to the test results. For example, the ABCMR concluded that "[t]he applicant's blood alcohol content is prima facie evidence that the applicant was under the influence of alcohol to a degree that he was rendered incapable of driving safely." Notably absent from the record is any discussion as to how much alcohol Sgt. Wells needed to consume in order to produce a test result of 0.235 and whether such an alcohol level would have allowed him to operate a vehicle even in an erratic fashion. These issues were raised by plaintiff below, but not addressed by the Army.

accident, the two witnesses whose names and addresses were listed on the accident report, the emergency personnel who treated Sgt. Wells at the accident site, nor any hospital personnel who treated him thereafter. To be sure, the IO's report explains that he made two attempts to contact the truck driver, but the report fails to explain why he did not contact the other material witnesses, thereby violating paragraph 40–8(f)(3)(c) of the regulations, which requires an IO to state the "[r]eason for not interviewing any witnesses whose testimony may be material." The failure to obtain these statements also appears to violate that portion of paragraph 40–8(g) of the regulations which indicates that an IO "shall" obtain "all other facts, observations, and opinions of others bearing on the question of actual impairment" so as to "determine the quantity and nature of the intoxicating agent used and the period of time over which used by the person."

For its part, defendant argues that the IO was not obliged to obtain these statements because the record he assembled provided more than adequate support for his finding that the accident was proximately caused Sgt. Wells' intoxication. Defendant emphasizes that this finding was upheld by all the reviewing authorities. A review of the administrative record, however, raises a number of important questions that might have been answered had statements been obtained. For example, in the absence of any statements from witnesses to the accident, the IO surmised that the accident occurred because Sgt. Wells took a wrong turn at an exit or entrance to the highway and thereby ended up driving in the wrong direction. The IO came to this conclusion apparently based on his observation [13] that there was no evidence that Sgt. Wells had driven across the grassy median that separated the east and westbound lanes. This observation, however, is in tension with the only witness statement upon which the IO relied, that of Lt. John M. Cushing, who accompanied Mrs. Wells to the accident scene some time after the accident occurred. In his statement, Lt.

Cushing did not indicate anything about a grassy median, but instead stated that "[w]hen traveling along the highway both in the east and west direction, I noticed that the median was wooded in some areas and had rock formations in the other. In no place that I can remember was there an easy passage way allowing for movement from the east bound lanes to the west bound lanes." The IO failed to explain the inconsistency between his observations and those of Lt. Cushing and, while he notes that the nearest exit/entrance to the highway was five miles from the accident scene, he fails to explain how Sgt. Wells, in his allegedly highly inebriated state, could have driven against the flow of traffic for those five miles without getting into an accident earlier along his path. Statements from the truck driver and the two other witnesses to the accident certainly would have shed light on these mysteries, making it unnecessary for the IO to speculate about the nature of the accident. *See Schwartz*, 26 Cl.Ct. at 998–99 (remanding LDI where IO failed to obtain statement from eyewitness to the accident).

In his report, the IO also placed great emphasis on Lt. Cushing's statement that he saw broken beer bottles in the car as further indication that Sgt. Wells' was intoxicated. This observation, indeed, is recited by each of the reviewing authorities. Nowhere in the formal reports, however, is it noted or discussed that Lt. Cushing stated not only that he saw smashed beer bottles in the car, but also that he "was unable to determine whether or not they were opened prior to the accident" or "how many beer bottles were present." While defendant argues that the reviewing authorities had Lt. Cushing's statement and weighed its value, there is no indication that they did so. Moreover, while the ABCMR placed weight on statements by the trooper and an emergency personnel that Sgt. Wells smelled of alcohol, the IO's failure to obtain statements from these individual leaves open the possibility that the alcohol they smelled was from the crushed beer bottles.[14] *See Schwartz*, 26 Cl.Ct. at 999 (re-

---

**13.** While, at oral argument, defendant asserted that the IO conducted an inspection of the acci-

dent site, nothing in the administrative record indicates that he did so.

**14.** The ABCMR's report states that the emergen-

manding LDI where IO failed to obtain statement from doctor who described plaintiff as an "intoxicated white male.")

Of course, it is not for this court to substitute its judgment for that of the board, *Citizens to Preserve Overton Park*, 401 U.S. at 416, 91 S.Ct. 814, and that is not why the court points to these evidentiary gaps and conflicting statements. Rather, at this stage, these deficiencies in the record serve simply to evidence the gravity of the IO's failure to obtain statements from material witnesses, such as the state trooper and medical personnel, who could have supplied critical facts and resolved potential ambiguities in the record. Defendant, however, counters by emphasizing that, even without these statements and the original results of the blood alcohol test, the evidence in the administrative record is substantial enough to support the ABCMR's LOD determination. But this assertion utterly misses the point. The question before this court is not whether the current record is adequate to support the ABCMR's LOD finding, but rather whether a record compiled consistent with the regulations would have supported such a finding. *See Puerto Rico Sun Oil Co. v. U.S. E.P.A.*, 8 F.3d 73, 77 (1st Cir.1993) (agencies are entitled to substantial deference "so long as procedural corners are squarely turned"). Contrary to the defendant's argument, this court cannot—and will not—assume that the original alcohol test records, as well as the missing statements from virtually all the material witnesses, would support the conclusion reached by the IO and, ultimately, the ABCMR. Much more than mere speculation is required under the Army's regulations, which presume that injuries to members are incurred in the line of duty, requires the Army to overcome that burden with "substantial evidence," and imposes a burden upon the Army of showing intoxication by a "clear showing."

### III. Conclusion

In conclusion, based on the incomplete record before this court, summary judgment is inappropriate. Accordingly, this case is remanded to the PERSCOM. "In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just." 28 U.S.C. § 1491(a)(2) (1994); *Schwartz*, 26 Cl.Ct. at 1000; *Barth v. United States*, 24 Cl.Ct. 836, 842 (1992). PERSCOM is the appropriate administrative body for remand since it is charged with responsibility for making the final LOD determination. Hence, this matter is remanded to PERSCOM for explanation and supplementation of its line of duty determination in light of the court's opinion.[15]

For the foregoing reasons, defendant's motion for summary judgment is denied without prejudice. This matter is remanded to PERSCOM in accordance with RCFC 60.1 for a period of 6 months. The proceedings before this court are suspended until September 18, 2000. The parties are directed to file joint reports indicating the status of proceedings on remand at intervals of 60 days, commencing with the date of this Opinion and Order. The first report shall be filed by May 17, 2000.

**IT IS SO ORDERED.**

---

cy room records indicate that "there was a strong odor of alcohol emanating from him" The medical records, however, actually state only "strong smell of ETOH."

15. A remand is not "merely for the purposes of rewriting the opinion so that it will superficially comply" with regulatory requirements, but rather, is meant "to entail a critical examination of the justification for the decision." *Fletcher v.* *Derwinski*, 1 Vet.App. 394, 397 (1991). *See also Schwartz v. United States*, 26 Cl.Ct. at 1000 n. 5. Along these lines, if, on remand, key medical documents and testimony are now demonstrably unavailable, it will be incumbent on·the Army to determine, at least initially, whether the LDI was fatally flawed by the IO's failure to pursue this information on a timely basis, following the accident.