**AMERICAN EXPRESS CO. and Affiliated Subsidiaries,**
**Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 97–624 T.**

United States Court of Federal Claims.

June 30, 2000.

Stephen D. Gardner, New York City, for plaintiff; Phillip Gall, Alan J. Lipner, Richard P. Romeo, Linda F. Worrell, of counsel.

Charles John Crueger, with whom were Paula M. Junghans, Acting Assistant Attorney General, Mildred L. Seidman, Chief, Steven I. Frahm, Assistant Chief, Court of Federal Claims Section, Tax Division, United States Department of Justice, Washington, DC, for defendant.

## OPINION

HEWITT, Judge.

Plaintiff, American Express Company (Amex), on its own behalf and as the common parent of an affiliated group of corporations that files consolidated federal income tax returns, seeks a refund of federal income tax payments, together with interest due, for the tax year ending December 31, 1987 (year in issue).[1] The portion of Amex involved in this case is its American Express Card business.

Amex filed Applications for Changes in Method of Accounting (collectively, the Application) on June 26, 1987, requesting permission to include annual card fees in gross income ratably over the twelve month period for which a card was valid. In making its Application, Amex relied on Revenue Procedure (Rev. Proc. or the Procedure) 71–21. That Revenue Procedure permits payment for services to be performed in the next taxable year to be deferred from gross income for the year in which they are received. The Internal Revenue Service (IRS or the Commissioner) denied this request, because the fees were not for services and Amex's

methodology for determining the amount of fees used for services did not produce the level accuracy required by Rev. Proc. 71–21. Amex then filed a timely claim for refund in the amount of $200,328,350, plus interest. Over six months elapsed after Amex filed its claim for refund without the IRS's taking action on the claim. Amex then sued for a refund in this court, claiming that the IRS had abused its discretion in denying the taxpayer's request for change in accounting method under Rev. Proc. 71–21. Both parties moved for summary judgment. The issues have been fully briefed and argued. Because the court finds that the IRS did not abuse its discretion in denying Amex's request for a change in accounting method, the government's Motion for Summary Judgment is GRANTED; Amex's Motion for Summary Judgment is DENIED.

## I. Background

Plaintiff began issuing personal charge cards in 1958, expanding this enterprise by 1987 to include three types of personal charge cards, corporate cards, and a credit card issued as a companion to the charge cards. Joint Stipulation of Facts (Stip.) ¶¶ 10–17. Generally, items bought with the charge cards are paid for at the end of the billing cycle, with a few exceptions involving a line of credit that is available with some cards. Id. at ¶ 44. Items bought with the credit card are paid for over time, with interest accumulating while the debt is outstanding. Id. at ¶ 45. At the end of 1987, Amex had issued a total of 27,121,000 cards. Id. at ¶ 20.

Amex charged an annual fee for these cards, ranging from $45 for the Personal Card to $250 for the Platinum Card. Id. at ¶ 27. Fees were charged annually, appearing on the first monthly statement for new cardholders and thereafter on the monthly statement preceding the next twelve month period. Id. at ¶ 29. Fees did not vary based on the annual account balance, or on the extent to which cardholders utilized card benefits. Id. at ¶¶ 31–32. If the cardholder

---

1. The facts in this paragraph are as set forth in the *Joint Stipulation of Facts* filed August 5, 1999.

canceled the card or if Amex canceled the card without cause, the cardholder was refunded a portion of the fee reflecting the amount of time that was left on the twelve month period. *Id.* at ¶ 33. For the year in issue, the total amount of fees billed was $1,158,622,258. *Id.* at ¶ 36. Amex realized fees in the net amount of $1,026,912,119. *Id.*

Amex provided a range of benefits to cardholders. *Id.* at ¶ 39. These benefits were described in detail in the guides mailed to new card holders when they received their cards. *Id.* Among these benefits were travel and baggage insurance, twenty four hour customer service, and a record of individual charges sent with each monthly bill. *Id.* at Joint Exhibit 23. The benefits a cardholder received increased as the amount of the annual fee for the card increased. *Id.* A study performed by Amex indicated that these benefits were one of the most important reasons why cardholders carried Amex cards despite higher fees for Amex cards than for cards of competitors. Stip. at ¶ 41 and Joint Exhibit 25.

Prior to the year in issue Amex included card fees in its income when the fees were billed. Stip. at ¶ 49. Beginning in late 1987, Amex changed its method of financial accounting on the basis of Financial Accounting Standards Board (FASB) No. 91 and restated its books to the beginning of that year. *Id.* Amex was required to make this change in its financial accounting by its auditor. Transcript of oral argument on cross-motions for summary judgment held on April 12, 2000(Tr.) at 61–62. While credit card fees were viewed by the Accounting Standards Board as payments to obtain the ability to borrow, FASB No. 91 required the fees to be included in income ratably over the twelve month period for which they were billed. Joint Exhibit 26 at ¶ 51.[2]

Amex complains that the Commissioner's denial of its Application was an abuse of discretion because the card fees met all the criteria for deferral under Rev. Proc. 71–21. Plaintiff's Motion for Summary Judgment (Pl.'s MSJ) at 5. The Application was denied initially because the IRS, as announced in General Counsel Memorandum 39,434 (G.C.M. 39,434 or the Memorandum) (Oct. 25, 1985), did not view card fees as payments for "contingent services," but rather viewed card fees as payments for credit. Stip. at ¶ 58 and Joint Exhibit 31. After the Application was denied, Amex asked that the decision be reconsidered. Stip. at ¶ 59. After reviewing information provided by Amex regarding an allocation of fees between credit and services, the IRS again denied the Application. *Id.* at ¶ 64 and Joint Exhibit 37. Amex then filed a tax refund request. When the request was not acted upon by the IRS for over six months, Amex filed its claim in this court seeking a tax refund of $198,649,152, plus interest and other relief. Stip. at ¶ 8. The refund requested reflects the ratable inclusion in Amex's gross income of all card fees without any allocation between fees allocable to services and to credit. Amex argues that because the amount of fees possibly allocable to credit is de minimis in comparison to the amount properly allocable to services, all fees should be ratably included in gross income as payments for services. Tr. at 23–24.

The parties also dispute (assuming the card fees were for services) whether allocation of the fees to the appropriate taxable year under Rev. Proc. 71–21 has been properly carried out by the taxpayer. Reply Brief in Support of Plaintiff's Motion for Summary Judgment and in Opposition to Defendant's Cross–Motion for Summary Judgment (Pl.'s Reply) at 13–14. Because the court finds that the Commissioner's determination that the card fees were not for contingent services within the meaning of

---

**2.** "A credit card fee represents a payment by the cardholder to obtain the ability to borrow from the lender under predefined conditions. Such borrowings take place at the option of the borrower. The Board noted that such arrangements provide opportunities to lend and concluded that the related fees represent commitment fees. The Board recognized that application of the interest method to the outstanding balances of a credit cardholder would be impracticable in most instances. Accordingly, this Statement requires the fee to be recognized on a straight-line basis over the period the fee entitles the cardholder to use the card." Joint Exhibit 26 at ¶ 51 (Financial Accounting Standards Board, *Statement of Financial Accounting Standards No. 91*, Fin. Acct. Series, Dec. 1986, at 24 ¶ 51).

Rev. Proc. 71–21 was not an abuse of discretion, the court does not examine the issue of the allocation of fees between the tax years.[3]

## II. Discussion

### A. Summary Judgment

Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Rule of the Court of Federal Claims (RCFC) 56(c); *Southfork Sys., Inc. v. United States,* 141 F.3d 1124, 1131 (Fed.Cir.1998) (quoting RCFC 56(c)). "It is well established that the Commissioner enjoys broad discretion to determine whether, in [his] opinion, a taxpayer's accounting methods clearly reflect income ... and the Commissioner's exercise of his discretion must be upheld unless it is clearly unlawful." *RCA Corp. v. United States,* 664 F.2d 881, 886 (2d Cir.1981) (internal quotations and citations omitted), cited with approval in *Dana Corp. v. United States,* 174 F.3d 1344, 1347–48 (Fed.Cir. 1999). The taxpayer has the burden of persuading the court that the Commissioner's decision was an abuse of discretion, or that it was clearly unlawful. *See Dana,* 174 F.3d at 1348. Disputes over facts which are not outcome determinative under governing law will not preclude the entry of summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Wells v. United States,* 46 Fed.Cl. 178, 181 (2000). There are no factual disputes in this case which are outcome determinative and the legal dispute on the relevant law is appropriate for summary judgment.

### B. Relevant Administrative and Statutory Law

#### 1. Revenue Procedure 71–21

Revenue Procedure 71–21 provides an exception to the general rule that "tax accounting requires that payments received for services to be performed in the future must be included in gross income in the taxable year of receipt." Rev. Proc. 71–21, 1971–2 C.B. 549 § 2. While the Revenue Procedure contemplates that the exception it provides will "reconcile tax and financial accounting treatment of such payments in a large proportion of these cases," *Id.,* its application is nevertheless restricted to "certain specified and limited circumstances." *Id.* § 1. Revenue Procedure 71–21 states:

> The purpose of this Revenue Procedure is to implement an administrative decision ... to allow accrual method taxpayers in certain specified and limited circumstances to defer the inclusion in gross income for Federal income tax purposes of payments received ... in one taxable year for services to be performed by the end of the next succeeding taxable year.

*Id.*

The scope of the transactions to which Rev. Proc. 71–21 applies is set out in section three:

> (.02) An accrual method taxpayer who, pursuant to an agreement (written or oth-

---

**3.** Section three of Revenue Procedure 71–21 sets out how an accrual basis taxpayer can allocate payments for services:

(.06) In any case in which an advance payment is received pursuant to an agreement which requires the taxpayer to perform contingent services, the amount of an advance payment which is earned in a taxable year through the performance of such services may be determined

(a) On a statistical basis if adequate data is available to the taxpayer;

(b) On a straight-line ratable basis over the time period of the agreement if it is not unreasonable to anticipate at the end of the taxable year of receipt that a substantially ratable portion of the services will be performed in the next succeeding taxable year; or

(c) By the use of any other basis that in the opinion of the Commissioner, results in a clear reflection of income.

Rev. Proc. 71–21, 1971–2 C.B. 549 § 3.06. With respect to this section, Amex asserts that it is reasonable to anticipate that a substantially ratable portion of services would be provided in the year following the year the card fees were received because the fees were refunded ratably when cards were canceled. Pl.'s Reply at 13–14. The government argues that the taxpayer did not meet its burden of showing that card holders utilized services ratably throughout the year. Defendant's Cross–Motion for Summary Judgment (Def.'s MSJ) at 17. The court does not decide this issue because it finds that the Commissioner did not abuse his discretion in deciding that the annual card fees were not payments for services.

erwise), receives a payment in one taxable year for services, where all of the services under such agreement are required by the agreement as it exists at the end of the taxable year of receipt to be performed by him before the end of the next succeeding taxable year, may include such payment in gross income as earned through the performance of the services . . . .

*Id.* § 3.02.

Amex asserts that the annual card fees fall within the scope of Rev. Proc. 71–21 in part because cardholders view the services provided as an important justification for carrying the American Express Card. Stip. at ¶ 41 and Joint Exhibit 25. Amex does acknowledge that a portion of the fees may have been paid to acquire credit but insists that the credit aspect of its cards was de minimis. Tr. at 25. Although Amex acknowledges that credit is regarded as a property right rather than a service and is not within the exception afforded by Rev. Proc. 71–21, it argues that the property right was sufficiently small in comparison with the services provided that the entire fee should be deferred under Rev. Proc. 71–21. *Id.* at 23–24; Pl.'s Reply at 7. The government counters that the primary reason for paying the fee was to acquire credit, and therefore the fee is not a payment for services which may be ratably included in gross income. Reply Brief in Support of Defendant's Cross–Motion for Summary Judgment (Def.'s Reply) at 5. Notwithstanding this conflict of factual contentions, both parties argue that they are entitled to summary judgment under applicable law.

### 2. Internal Revenue Code § 446

Revenue Procedure 71–21 was promulgated pursuant to the Commissioner's discretion granted under § 446 of the Internal Revenue Code (the Code), which provides for the permissible methods of accounting to be used in determining taxable income. Section 446 states in part:

(b) Exceptions—If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method

as, in the opinion of the Secretary, does clearly reflect income.

I.R.C. § 446(b).

Section 446 also contains an explicit requirement regarding a change in accounting method. The Code states that "a taxpayer who changes the method of accounting on the basis of which he regularly computes his income in keeping his books shall, before computing his taxable income under the new method, secure the consent of the Secretary." I.R.C. § 446(e). The Commissioner has broad discretion in determining what changes in method of accounting may be made. *See Piccadilly Cafeterias, Inc. v. United States,* 36 Fed.Cl. 330, 335 (1996) (citing *United States v. Catto,* 384 U.S. 102, 114, 86 S.Ct. 1311, 16 L.Ed.2d 398 (1966)). The Commissioner is "not . . . obliged to permit taxpayers to shift their accounting methods to accommodate every fluctuation in the revenue laws." *Catto,* 384 U.S. at 115, 86 S.Ct. 1311.

### C. Amex's Complaint About the Commissioner's Exercise of Discretion

Amex's primary contention in this matter is that annual card fees fall within the terms of Rev. Proc. 71–21 and that "[w]hen a taxpayer meets the requirements of Rev. Proc. 71–21, deferral is permitted." Pl.'s MSJ at 5. Amex argues that its card fees are payments for services. *Id.* at 7. In particular, Amex complains that the Commissioner's use of G.C.M. 39,434 to determine that the card fees were not for services was improper because the memorandum had materially different facts and was not published for public review. Pl.'s Reply at 3–5. Amex also complains that the Commissioner failed to follow two recent Tax Court cases that dealt with this specific issue. *Id.* at 15–16. Amex asks the court to conclude that the Commissioner's decision that card fees were not payments for services was erroneous to a degree that constituted an abuse of discretion. Pl.'s MSJ at 22.

### D. Standard of Review

According to the precedent of this and other courts, "the Commissioner enjoys broad discretion to determine whether, in his opinion, a taxpayer's accounting methods

clearly reflect income." *Dana Corp. v. United States,* 174 F.3d 1344, 1347–48 (Fed.Cir. 1999) (internal quotations omitted) (quoting *RCA Corp. v. United States,* 664 F.2d 881, 886 (2d Cir.1981)). The taxpayer has the burden of persuading the court that the IRS decision was an abuse of discretion, or clearly unlawful. *See Dana,* 174 F.3d at 1348. Thus, the task of the reviewing court is not to determine whether, in its own opinion, a taxpayer's method of accounting clearly reflected income, "but to determine whether there is an adequate basis in law for the Commissioner's conclusion that it did not." *RCA,* 664 F.2d at 886.

■ Amex agrees that the plaintiff must show there has been an abuse of discretion. Amex insists, however, that such an abuse occurred in this case. Pl.'s MSJ at 21. Amex argues that the Commissioner, having issued Rev. Proc. 71–21 and invited reliance on its terms, must abide by its provisions. *Id.* at 22. Amex's view is that, once the Commissioner announces standards he will follow, he must abide by them, even if he did not have to announce those standards. Pl.'s Reply at 16. Because the Commissioner "failed to observe self-imposed limits upon his exercise of discretion" when he denied Amex's Application, he abused his discretion. Pl.'s MSJ at 21 (quoting *Barnett Banks of Florida v. Commissioner,* 106 T.C. 103, 116, 1996 WL 85847 (1996)).

E. Commissioner's Decision to Deny Amex's Request for Change in Accounting Method Was Neither an Abuse of Discretion Nor Clearly Unlawful

In order to determine whether the Commissioner abused his discretion in denying plaintiff's Application, the court examines whether the Commissioner's decision was an abuse of discretion or clearly unlawful. *See Dana,* 174 F.3d at 1348. If the Commissioner's decision has an adequate basis in law,

then that determination must be upheld. *See RCA,* 664 F.2d at 886.

The text of Rev. Proc. 71–21 is not in conflict with the Commissioner's determination that the card fees were not paid for services and therefore could not be ratably included in gross income. The stated purpose of the Revenue Procedure was to allow accrual method taxpayers "in certain specified and limited circumstances" to defer revenue received for services in gross income. Rev. Proc. 71–21 § 1. The Revenue Procedure also limits its purpose to the reconciliation of tax and financial accounting treatment of these payments in many, but not all cases. *Id.* § 2.

The Revenue Procedure contemplates that the Commissioner has discretion to determine if a taxpayer falls within these "specified and limited circumstances." *Id.* § 1. Of course, this discretion is not without limits; the Commissioner cannot make a decision that is clearly unlawful because it is contrary to the will of Congress or is otherwise arbitrary and capricious. *See Dana,* 174 F.3d at 1348. That is not the case here. The text of Rev. Proc. 71–21 itself explicitly limits its application to certain "specified and limited circumstances." Rev. Proc. 71–21 § 1. Furthermore, none of the several examples of payments that could fall within the terms of the Revenue Procedure are closely analogous to the situation Amex presents. *See id.* § 3.12.

General Counsel Memorandum 39,434, promulgated on October 25, 1985, articulated the view that card fees do not fit within the exception provided by Rev. Proc. 71–21 because card fees were not payments for services. *See* G.C.M. 39,434 (Oct. 25, 1985). While the memorandum addressed a factual situation that was somewhat different than Amex's, it represents general IRS policy regarding card fees.[4]

Amex argues that no deference should be given to G.C.M. 39,434 because the memo-

4. The facts of G.C.M. 39,434 involved non-refundable annual card fees charged by a multibank holding company. In G.C.M. 39,434 the taxpayer characterized the fee to its cardholders as a way for all cardholders to share the cost of bank card services. In its submission to the IRS, the taxpayer characterized the fee as a charge for the service of maintaining an open line of credit. By contrast, Amex's card fees are refundable, and it has not characterized its fees as being charged for maintaining an open line of credit in either its cardholder agreement or correspondence with the IRS.

randum was never published and involves different facts. Pl.'s Reply at 3–5. With respect to the precedential value of a G.C.M., Amex cites the Internal Revenue Manual, which states that a general counsel memorandum is "not to be regarded as a statement of Internal Revenue Service position." *Id.* at 4 (citing I.R.M. (39)(10)10, *available in* LEX-IS, CCHTAX Library, CCHIRM File). Amex also argues that the facts in G.C.M. 39,434 should be viewed as analogous to the facts in a recent Tax Court case, *Signet Banking Corp. v. Commissioner,* 106 T.C. 117, 1996 WL 85845 (1996), *aff'd,* 118 F.3d 239 (4th Cir.1997), supporting the disallowance of ratable inclusion in income under Rev. Proc. 71–21 with respect to non-refundable fees for a card that provided limited services. Pl.'s Reply at 5–6.

In *Signet,* just as in the G.C.M., annual card fees involved were found to be payments for credit, not for services. General Counsel Memorandum 39,434 relied on the characterization of the fee as a fee charged for maintaining an open line of credit. Similarly, in *Signet* the facts on which the decision focused were the non-refundability of the card fee and the express declaration in the agreement that the annual fee was charged to maintain a line of credit. *See Signet,* 106 T.C. at 117, 127.

The government counters that, notwithstanding some factual differences, the Commissioner was entitled to consider the position of G.C.M. 39,434 in ruling under Rev. Proc. 71–21 that card fees are payments for credit, not for services. Def.'s Reply at 9–10. To support this contention, the government cites *Snap–On Tools, Inc. v. United States,* 26 Cl.Ct. 1045 (1992), *aff'd,* 26 F.3d 137 (Fed. Cir.1994), which states that while general counsel memoranda do not have precedential authority, they are "evidence of the Commissioner's administrative practice," thereby providing at least some notice of the Commissioner's view. *Snap–On Tools,* 26 Cl.Ct. at 1060. The government also argues that G.C.M. 39,434 was available to the public online and in print, so whether it was actually "published" is immaterial. Def.'s Reply at 10 n. 2. Indeed, Amex itself asked the IRS to review G.C.M. 39,434 during the administra-

tive adjudication of the dispute, which the Commissioner did. *Id.* The Commissioner found that G.C.M. 39,434 still articulated the policy of the IRS regarding the proper treatment of card fees under Rev. Proc. 71–21. Stip. at Joint Exhibit 29. The Commissioner's position is consistent with *Chicago Milwaukee Corp. v. United States,* 40 F.3d 373 (Fed.Cir.1994), in which the Court of Appeals for the Federal Circuit stated that general counsel memoranda "function as a body of working law within the IRS." *Chicago Milwaukee,* 40 F.3d at 376 (quoting *Taxation with Representation Fund v. IRS,* 646 F.2d 666, 683 (D.C.Cir.1981)). While not serving as authoritative precedent, G.C.M. 39,434 could have reasonably been used by the Commissioner for legal guidance in reaching his decision in this case that card fees were not payment for services under Rev. Proc. 71–21.

Together, G.C.M. 39,434 and the text of Rev. Proc. 71–21 provide an adequate basis in law for the Commissioner's decision that the card fees in issue did not fall within the specified and limited circumstances of Rev. Proc. 71–21. The court's view that there is an adequate basis in law for the Commissioner's decision is not altered by and is in several respects confirmed by further examination of plaintiff's arguments.

The court does not agree with Amex that the Commissioner "invited reliance" on the Revenue Procedure and therefore abused his discretion by not following the standards presented there. Far from inviting reliance, Amex was given notice of the IRS position through G.C.M. 39,434, even if the Memorandum was not formally published. While the Memorandum is, of course, based on different facts than the present case, it nonetheless articulates the position held by the IRS that card fees are not payments for services. Amex was aware of the IRS position on this issue, so it should not have been surprised when its Application was denied.

Nor does the court agree with Amex that *Barnett Banks of Florida v. Commissioner,* 106 T.C. 103, 1996 WL 85847 (1996), taken together with the decision in *Signet,* requires that a lesser degree of deference be accorded to the Commissioner's decision that the card

fees do not qualify as payments for services. *Barnett* and *Signet* were issued by the Tax Court on the same day but reached different results. *Barnett* held that Rev. Proc. 71–21 should be interpreted to permit the taxpayer ratably to include Visa card fees in gross income. *See Barnett,* 106 T.C. at 116. When Barnett Banks of Florida began charging an annual fee for its previously-issued Visa cards, it began providing additional services to its cardholders. *See id.* at 107–108. Barnett's card fee was refundable to the cardholder on a pro-rated basis if the card was canceled, based on the number of months remaining in the twelve month period for which the fee was charged. *See id.* at 107. In *Signet,* the annual fee was not refundable, and there were no additional services offered when the fee was introduced. *See Signet,* 106 T.C. at 127. In addition, Signet's membership agreement specifically stated that the fee was paid to establish credit. *See id.* at 117. On the basis of these distinctions, the Tax Court in *Signet* concluded that the annual card fees in *Signet* were not for services, and therefore could not be ratably included in gross income under Rev. Proc. 71–21. *See id.* at 128–129. On the basis of similar distinctions, the Tax Court in *Barnett* came to the opposite conclusion. *See Barnett,* 106 T.C. at 116. Amex argues that these cases support its position—*Barnett* directly and *Signet* by contrast. Pl.'s Reply at 23–24. In Amex's view its cards have the two properties which were critical to the Tax Court in *Barnett:* the cards make valuable services available and the card fees are refundable. The government counters that Amex has misinterpreted the terms of Rev. Proc. 71–21 and the extent to which those terms, properly interpreted, limit the Commissioner's discretion. Def.'s Reply at 5.

In the view of the court, neither *Barnett* nor *Signet* fully addresses the question of whether there was an adequate basis for the Commissioner's exercise of discretion under Rev. Proc. 71–21. The Tax Court in both *Barnett* and *Signet* appears to decide anew the facts of those cases. Based on the particular facts before him, the Commissioner reached a different conclusion. Whether or not *Barnett* and *Signet* "elevate form over substance," as the government suggests,

Def.'s Reply at 14, those cases do appear to invite the court to make judgments based on close factual distinctions and to exercise intense scrutiny over matters within the discretion of the Commissioner, if that exercise is not an abuse of discretion or contrary to law.

The court views the other authorities cited by plaintiff as consistent with this conclusion. In *Hewlett–Packard Co. v. United States,* 71 F.3d 398 (Fed.Cir.1995), *rev'g Apollo Computer, Inc. v. United States,* 32 Fed.Cl. 334 (Fed.Cl.1994), the Court of Appeals for the Federal Circuit reversed a ruling of this court after trial that the Commissioner had correctly determined that the taxpayer's rotable spare parts pool was inventory, not a capital asset. *See Hewlett–Packard,* 71 F.3d at 399. The trial court had stated, "The IRS's characterization of Rotable Spare Parts as inventory must be sustained unless such determination was so contrary to the applicable I.R.C. provisions and Treasury Regulations as to be arbitrary and an abuse of discretion." *Apollo Computer,* 32 Fed.Cl. at 347–48. The Federal Circuit disagreed with the deference extended by the trial court to the Commissioner, stating in part:

> We disagree with the Court of Federal Claims that Apollo's repair operation was a mixed service and merchandising business in which Apollo sold its rotable spare parts to its customers. The undisputed facts show that Apollo's maintenance business was a service business in which it maintained the pool of rotable spare parts in order to provide better service to its customers.

*Hewlett–Packard,* 71 F.3d at 400.

In *Hewlett–Packard* the Federal Circuit held that the Commissioner could not exercise discretion without any factual basis. *See id.* at 403. Here the facts show that the relevant financial accounting standard itself stated that card fees are commitment fees for the opportunity to lend. Joint Exhibit 26 at ¶ 51. Since Amex based its change in accounting methods on the change of standards in Financial Accounting Standards Board No. 91, plaintiff must have been aware of the possible characterization of fees as

payments for credit. *Hewlett–Packard* stands for the proposition, inapplicable here, that courts should not extend deference in a case where nothing supports the Commissioner's determination and the determination is contrary to the undisputed facts.[5]

Nor does *Dana Corp. v. United States,* 174 F.3d 1344 (Fed.Cir.1999), control this case. In *Dana,* the Court of Appeals for the Federal Circuit reviewed the Commissioner's determination that the cash method of accounting used by the taxpayer did not clearly reflect income, which led to requiring the taxpayer to recalculate its income tax under the accrual method. *See Dana,* 174 F.3d at 1346. The Court recognized that the Commissioner has "'broad discretion' to determine whether, 'in his opinion' a taxpayer's accounting methods clearly reflect income," *Id.* at 1347–48 (quoting *Thor Power Tool Co. v. Commissioner,* 439 U.S. 522, 540, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979)), but held that this deference must give way when the Commissioner's decision is contrary to the expressed will of Congress, contained in applicable statutory language. *See Dana,* 174 F.3d at 1348. Here, unlike *Dana,* there is no Congressional expression other than Internal Revenue Code § 446—which by its terms grants the Commissioner broad discretion—that bears on this case.

Finally, *Estate of Shapiro v. Commissioner of Internal Revenue,* 111 F.3d 1010 (2d Cir.1997), does not support a different outcome in this case. The Court of Appeals for the Second Circuit in *Estate of Shapiro* examined an unpublished policy of the IRS not to afford taxpayers relief under Revenue Procedure 81–27[6] when the taxpayer was also bringing a Tax Court case. *See Estate of Shapiro,* 111 F.3d at 1018–19. The court found the policy to be reasonable because of the difficulty of coordinating collection activities while the ultimate amount of estate tax liability remained in question during the pendency of a Tax Court case. *See id.* at 1019. Because the IRS followed a reasonable policy, the Commissioner did not abuse his discretion in refusing to allow the taxpayer to invoke Rev. Proc. 81–27. *See id.*

Amex argues, on the basis of *Estate of Shapiro,* that the Commissioner has abused his discretion in this case because the IRS has failed sufficiently to explain why card fees are *not* payments for services. Pl.'s Reply at 16–17. The court disagrees that the Commissioner has the burden of providing such an explanation in this case. Here, Amex has the burden of showing that the decision by the Commissioner was an abuse of discretion or clearly unlawful. The Commissioner in this case relied on G.C.M. 39,-434, which stated the IRS's position that card fees are not payments for services, and therefore not eligible for deferral under Rev. Proc. 71–21. Stip. at ¶ 58 and Joint Exhibit 31. This view was not unreasonable based on the level of deference given to general counsel memoranda within the IRS. *See Chicago Milwaukee,* 40 F.3d at 376. Moreover, the view expressed in G.C.M. 39,434 was consistent with view of the accounting industry expressed in FASB No. 91.

---

5. As an additional matter, *Hewlett–Packard* involved a slightly different issue than the present situation: whether the IRS could require a company to change its accounting methods (rather than, as here, a decision on a change requested by a taxpayer). *See Hewlett–Packard,* 71 F.3d at 399. The Commissioner's decision to require a taxpayer to change its method of accounting may involve a somewhat less deferential standard of review. *See id.* at 400 ("The issue before this court is whether the Commissioner properly rejected, as not clearly reflecting income, Apollo's accounting treatment of its rotable spare parts pool as a capital asset . . . ."). The Commissioner cannot require a taxpayer to change from one method of accounting that clearly reflects income to another simply because the Commissioner believes his method is better. *See Ansley–Sheppard–Burgess Co. v. Commissioner,* 104 T.C. 367, 371, 1995 WL 131530 (1995). The court

may scrutinize more closely the Commissioner's sua sponte determination that the taxpayer's existing method of accounting does not clearly reflect income. *See, e.g., Hewlett–Packard,* 71 F.3d at 400.

6. Rev. Proc. 81–27 was enacted "to set forth the procedure to be followed by an estate when installment payments due under sections 6166 or 6166A of the Internal Revenue Code are recomputed because of a reduction in the estate tax caused by the payment of interest on the tax due." *Estate of Shapiro,* 111 F.3d at 1017. Unlike Rev. Proc. 71–21, the purpose of Rev. Proc. 81–27 is to establish a procedure that will be followed by an estate in all cases where installment payments are recomputed. *See* Rev. Proc. 81–27, 1981 –2 C.B. 547 § 1.

*Estate of Shapiro* stands for the proposition that the Commissioner may not ignore a revenue procedure for no reason. That is not the case here. The General Counsel Memorandum and the plain meaning of Rev. Proc. 71–21 provided a sufficient legal basis for denying Amex's Application. There is no evidence that the Commissioner ignored the Revenue Procedure, nor is there evidence that he made an unreasonable determination. He merely made a determination of applicability that Amex does not agree with.

III. Conclusion

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is DENIED. Defendant's Motion for Summary Judgment is GRANTED. The Clerk of the United States Court of Federal Claims shall enter judgment for the United States. Each party shall bear its own costs.

IT IS SO ORDERED.